**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ORGANIZED COMMUNITIES AGAINST DEPORTATION; BRIGHTON PARK NEIGHBORHOOD COUNCIL; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS; and RAISE THE FLOOR ALLIANCE,<br><br>Plaintiffs,<br><br>v.<br><br>BENJAMINE HUFFMAN, Acting Secretary of the United States Department of Homeland Security; CALEB VITELLO, Acting Director of Immigration and Customs Enforcement; and IMMIGRATION AND CUSTOMS ENFORCEMENT in their official capacities,<br><br>Defendants. | Case No. 25-cv-868 |

Plaintiffs ORGANIZED COMMUNITIES AGAINST DEPORTATION; BRIGHTON PARK NEIGHBORHOOD COUNCIL, ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, and RAISE THE FLOOR ALLIANCE, by their undersigned attorneys, hereby complain against Defendants, and state as follows.

**INTRODUCTION**

1.      The Plaintiffs are all Chicago-based organizations that provide advocacy and support to Chicago neighborhoods and immigrant communities. They are also leaders in the national Sanctuary City Movement, which advocates for a

1

constellation of policies and support aimed at creating vibrant, welcoming communities where immigrants and all people can thrive. Sanctuary Cities adopt "a variety of policies intended to engender a greater level of trust and cooperation between local law enforcement and communities with sizable immigrant populations, regardless of immigration status. These policies include offering English-language classes; issuing municipal identification documents and driver's licenses to all residents. . ." [1]

2.      Sanctuary City policies are entirely lawful, improve community safety,[2] and provide economic benefits both to U.S. citizens and people who are undocumented.[3] These laws—and the movement that birthed them—reflect communities' respect for the human dignity of all people and commitment to the universal common good.[4]

3.      The Plaintiffs and their membership proudly advocate for and help sustain Chicago's status as the third largest Sanctuary City in the United States.[5] This is why Donald Trump's administration has declared Chicago "ground zero"[6] for

---

[1] *Sanctuary Policies: An Overview*, American Immigration Council (Dec. 2023), https://www.americanimmigrationcouncil.org/sites/default/files/research/sanctuary_policies_an_overview.pdf.

[2] Heidi Altman and Jordyn Rozensky, *The Safety of Sanctuary Cities and the Immigrant Revitalization Perspective*, National Immigrant Justice Center (Oct. 16, 2020), https://immigrantjustice.org/staff/blog/safety-sanctuary-cities-and-immigrant-revitalization-perspective; s*ee also* Alex Nowrasteh, Andrew C. Forrester, and Michelangelo Landgrave, *Illegal Immigration and Crime in Texas*, Cato Institute (Oct. 13 2020) https://www.cato.org/sites/cato.org/files/2020-10/working-paper-60.pdf (counties with larger populations of undocumented immigrants have lower rates of violent crime).

[3]Alexander D. Natanson, *Economic Impacts of Sanctuary and ICE Policies Inclusive and Exclusive Institutions* (2021) https://appliedecon.oregonstate.edu/sites/agscid7/files/applied-economics/economic_impacts_of_sanctuary_and_ice_policies.pdf.

[4] Eli S. McCarthy, *A Virtue-Based Just Peace Ethic*, Journal of Moral Theology Vol. 7, No. 2 92-101 (June 2018).

[5] Federation for American Immigration Reform, Ten of the Largest Sanctuary Cities in the U.S.

[6] Emily Soto, *Chicago Alderpeople React to Claims City Will Be Ground Zero for Mass Deportations*, WTTW (Dec. 12, 2024).

immigration enforcement. The federal government intends to "make an example"[7] of Chicago and target Plaintiffs' communities with immigration raids in an attempt to destroy the Sanctuary City Movement.

4.      President Trump and his cadre of advisors consistently spew vitriol towards the Sanctuary City Movement. They have pledged to dismantle Sanctuary Cities and publicly affirmed that immigration raids would target Chicago in order to "make an example"[8] out of the City and discourage the further spread of the Sanctuary City Movement. The federal government's plan to use Chicago-based immigration raids to quash the Sanctuary City Movement is a clear and obvious violation of the First Amendment.

5.      The Trump administration has promised and has recently commenced[9] its plan for an unprecedented wave of mass deportations, which will separate families, devastate local economies, and tear at the very fabric of our communities while fostering massive intimidation and fear that impedes Plaintiff's Sanctuary advocacy.

6.      This lawsuit seeks to enforce the Plaintiffs' rights under the First Amendment of the United States Constitution and the Administrative Procedures Act. Plaintiffs seek temporary and permanent injunctive relief so they can continue their Sanctuary City advocacy and movement work unimpeded by the Trump

---

[7] Mark Moore, _Trump's Incoming Border Czar Tom Homan Promises 'Big Raid Across the Country' Starting Tuesday_, The Latin Times (Jan. 18, 2025).
[8] _Id._
[9] Ali Bauman, _Newark mayor says business raided by ICE agents, multiple people detained_, CBS News, (Jan. 24, 2025).

administration's unlawful attempts to silence them. Plaintiffs also seek an order vacating the Defendants' policy of initiating Chicago-based immigration raids for the unlawful purpose of targeting and suppressing the Plaintiffs' Sanctuary City Movement.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331, and the United States Constitution's First Amendment.

8.      Declaratory and injunctive relief is sought as authorized in 28 U.S.C. § 2201 and 2202, and vacatur under 5 U.S.C. § 702.

9.      Venue is proper under 28 U.S.C. 1391(b). Defendants are United States agencies or officers sued in their official capacities. Plaintiffs are community groups whose residents reside in the State of Illinois, and the events giving rise to this complaint occurred, are occurring, and will occur in the State of Illinois, within the City of Chicago.

## PARTIES

10.  Plaintiff BRIGHTON PARK NEIGHBORHOOD COUNCIL ("BPNC") is a community-based, nonprofit organization serving a working-class neighborhood on Chicago's Southwest Side. BPNC's mission is to create a safer community, improve the learning environment at public schools, preserve affordable housing, provide a voice for youth, protect immigrant rights, promote gender equality, and end all forms of violence, including police violence.  As a result of U.S. Immigration and Customs Enforcement's (ICE) planned immigration raids targeting Chicago for its sanctuary

policies, the BPNC is forced to spend additional time and money developing new policies and trainings for staff regarding potential enforcement action at their workplaces and supporting a coalitional effort to respond to community requests via a rapid response hotline, diverting resources away from the organization's focus on other social justice issues critical to its mission, including education, housing, immigration, and gender. The BPNC brings this action on its own behalf and as an organizational representative.

11. Plaintiff ORGANIZED COMMUNITIES AGAINST DEPORTATION ("OCAD") is an undocumented-led group that organizes against deportations, detention, criminalization, and incarceration, of Black, brown, and immigrant communities in Chicago and surrounding areas. Through grassroots organizing, legal and policy work, and cross-movement building, OCAD aims to defend its communities, challenge the institutions that target and dehumanize its communities, and build collective power. OCAD fights alongside families and individuals challenging these systems to create an environment for its communities to thrive, work, and organize with happiness and without fear. As a result, OCAD is forced to spend additional time and resources addressing the devastating consequences suffered by its members and the communities it supports and represents as a result of the planned raids, diverting resources away from the organization's focus on other social justice issues critical to its mission, including immigration, racial, economic, and gender justice. OCAD brings this action on its own behalf and as an organizational representative.

12. Plaintiff ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS, INC. ("ICIRR") is a non-profit organization based in Chicago, Illinois. ICIRR promotes the rights of immigrants and refugees to full and equal participation in civic, cultural, social, and political life in Illinois and beyond. ICIRR has nearly 100 member organizations throughout Illinois. Member organizations include community health centers, health and nutrition programs, social service providers, neighborhood associations, and other organizations that work to ensure immigrants receive the support they need for their families to be successful. Because of the planned ICE raids in Chicago, ICIRR has diverted resources away from core organizational policy advocacy work toward, and is instead coordinating rapid response efforts and trainings for impacted communities. ICIRR brings this action on its own behalf and as an organizational representative.

13. Plaintiff RAISE THE FLOOR ALLIANCE ("RTF") is a coalition of community-based worker centers who build power in low-wage industries, predominantly among non-union workers. RTF's efforts are focused on industries with high rates of immigrant and undocumented populations–domestic work and cleaning, day labor, temporary staffing, warehouses, restaurants, and food production. RTF works closely with and for undocumented workers as they combat conditions in labor markets and the political economy that allow for the exploitation of working people. RTF has been involved in sanctuary city advocacy in Chicago for almost a decade. In response to the impending raids, RTF has diverted resources away from its core mission of protecting and building power among low-wage

workers and is instead addressing responses and plans for immigration raids in workplaces. It has been forced to deviate from planned meeting agendas that are germane to its core mission of improving workplace conditions for low wage workers in order to educate and protect portions of its base from threats of deportation and to educate workers not under direct threat of deportation as to how to support vulnerable workers. It has conducted workshops on how to respond to ICE and worksite raids. Its entire staff has revamped existing work plans in order to prioritize the needs of the heavily immigrant communities it and its member organizations serve. RTF brings this action on its own behalf and as an organizational representative.

14. Defendant Benjamine Huffman is the acting secretary of the U.S. Department of Homeland Security. In this capacity, he is charged with enforcing and administering U.S. immigration laws. He is sued in his official capacity. The Department of Homeland Security (DHS) is a Cabinet-level department of the U.S. government. Its stated missions involve anti-terrorism, border security, immigration, and customs.

15. Defendant Caleb Vitello is the Acting Director for U.S. Immigration and Customs Enforcement. In this capacity, he is charged with administering the enforcement of United States immigration law. He is sued in his official capacity.

16. Defendant Immigration and Customs Enforcement (ICE) is a component agency of DHS. ICE enforces immigration and customs law and is

responsible for the detention and removal of immigrants, as well as conducting enforcement actions like raids.

## FACTUAL ALLEGATIONS

### A.     Plaintiffs' Advocacy has Sustained Chicago as a Sanctuary City

17.     Plaintiffs are leaders in the Chicago-based Sanctuary City Movement. As a result of this movement, for decades, Chicago has been a Sanctuary City. It initially adopted the designation in the 1980s via an Executive Order from then-Mayor Harold Washington. In 2006, the City Council passed a Welcoming Cities Ordinance (WCO). In 2016 and in years following, Plaintiffs collaborated with City officials to ensure that—in the wake of Defendant Trump's 2016 election—Chicago's Sanctuary City protections for immigrants remained strong and intact.

18.     The Ordinance, Chapter 2-173 of the Chicago Municipal Code, recognizes the strength that accrues to the City by virtue of its diversity and its immigrant populations.

19.     Section 2-173-020 prohibits City agencies from requesting information about or otherwise investigating the citizenship or immigration status of any person unless required by other law, with limited exceptions.

20.     Section 2-173-030 prohibits the disclosure of information regarding the citizenship or immigration status of any person unless otherwise provided for by federal law or legal process, or with consent of the individual.

21.     Section 2-173-040 prohibits the City from conditioning City benefits, opportunities, or services on citizenship or immigration status unless required by other law.

22.     Section 2-173-042 limits City agencies' participation in immigration enforcement.

23.     The Seventh Circuit Court of Appeals analyzed Chicago's Sanctuary City ordinance and concluded that the law does not provide for any affirmative interference with immigration enforcement. Instead, Chicago's law prohibits local law enforcement from aiding in "civil immigration enforcement through informing the federal authorities when persons are in their custody and providing access to those persons at the local law enforcement facility." *City of Chicago v. Sessions,* 888 F.3d 272, 282 (7th Cir. 2018), *reh'g en banc granted in part*, *opinion vacated in part*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacated*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). The Appellate Court noted that decisions regarding the allocations of local law enforcement resources are generally left to local officials—and for good reason: "Some localities might choose to cooperate with federal immigration efforts, and others may see such cooperation as impeding the community relationships necessary to identify and solve crimes. The choice as to how to devote law enforcement resources—including whether to use such resources to aid in federal immigration efforts—would traditionally be one left to state and local authorities." *Id.*

24.     Following Defendant Trump's election in 2024, City of Chicago Mayor Brandon Johnson, in collaboration with the Plaintiffs, re-affirmed the City's commitment to the goals of Plaintiffs' Sanctuary City Movement. Mayor Johnson stated that Chicago "will not bend or break… Our values will remain strong and firm. We will face likely hurdles in our work over the next four years, but we will not be stopped and we will not go back."[10]

25.     Plaintiffs have been and continue to be outspoken advocates for Chicago's status as a sanctuary city.

26.     For example, OCAD and its members have participated in public advocacy around the Welcoming City ordinance for years. In 2015, OCAD became a founding member of the Chicago Immigration Working Group (CIWG), which aimed to keep a clear line of separation between local police and federal immigration authorities. This work and outspoken advocacy have been consistent through four different mayoral administrations.

27.     OCAD's advocacy has continued to the present. In January 2025, its members rallied to help defeat challenges to the Ordinance proposed by members of Chicago's City Council. Those challenges would have eliminated the Ordinance's strongest protections and negatively impacted OCAD's members.

28.     Similarly, ICIRR and its coalition partners have long supported the sanctuary movement at both the local and state level. In 2012, ICIRR successfully

---

[10] Heather Cherone, *Chicago Will Remain a Sanctuary City, Despite Donald Trump's Threats, Mayor Brandon Johnson Says*, WTTW (Nov. 12, 2024),

advocated to expand Chicago's existing ordinance. For the next decade, ICIRR drafted language for amendments to the ordinance and publicly organized for their passage until the ordinance's carve outs were eliminated in 2021.

29.     In January 2025, like OCAD, ICIRR and its coalition members played a key role in helping to defeat the harmful amendments proposed by two members of Chicago's City Council.

30.     ICIRR also continues to engage in sanctuary advocacy at the state level and in other Illinois municipalities. It has forcefully supported the passage of robust sanctuary laws in those venues, including most recently in Evanston, through its development of model policies and drafting and strategizing support.

31.     Likewise, BPNC and its participants have been vocal in their support of Chicago's status as a sanctuary city.

32.     Specifically, over the last five years, BPNC has invested resources in organizing mayoral and alderman candidate forums to persuade new candidates to support the elimination of prior carve outs in the Welcoming City ordinance. BPNC has also collaborated with the Sanctuary for All coalition to develop city-wide strategies to grow protections for immigrants. More broadly, BPNC has successfully advocated and organized to create sanctuary policies in Chicago public schools and to strengthen sanctuary provisions at the state level.

33.     Like OCAD and ICIRR, in early January BPNC also protested the effort by two members of Chicago City Counsel to dilute the protections of the Welcoming City ordinance.

34.     RTF also has consistently engaged in advocacy regarding the Welcoming City ordinance. Like OCAD, ICIRR, and BPNC, RTF team members advocated for the policy and helped to educate workers about the change in policy in Chicago. Through its strategic communications work, RTF highlighted cases of arrests that led to immigration consequences for immigrant workers, calling attention to the need for stronger protections in the Welcoming City ordinance prior to the elimination of carve outs in 2021.

35.     During the recent effort in 2025 to roll back some of the protections of the Welcoming City ordinance, RTF leadership held meetings with Chicago alderpeople pushing them to reject proposed carve outs. RTF also submitted a written public comment and requested the opportunity to speak in opposition in preparation for the public meeting on the proposed carve outs.

36.     In addition to being a Sanctuary City, Chicago is also a certified Welcoming City. "Certified Welcoming" is a formal designation for cities and counties that have created policies and programs reflecting their values and commitment to immigrant inclusion. This innovative program assesses city and county governments on their efforts to include and welcome immigrants in all areas of civic, social, and economic life in their communities."[11] Plaintiffs further Chicago status as a Welcoming City by organizing mutual aid and other supports to help meet the needs of immigrants, their families and communities.

### B.     Sanctuary and Welcoming City Policies Create Better Communities for People of All Immigration Statuses

---

[11] Chicago's status as a 'Certified Welcoming' city can be viewed at https://welcomingamerica.org/initiatives/certified-welcoming/.

37.     Cities, like Chicago, which adopt Sanctuary policies have lower crime rates compared to cities without those policies. There are, on average, 35.5 fewer crimes committed per 10,000 people in (sanctuary) counties compared to counties [without Sanctuary City protections]."[12] Sanctuary City policies "significantly reduce the most extreme form of domestic violence: domestic homicide. Sanctuary City policies lower "the domestic homicide rate for [Latina] women by 62%."[13]

38.     No studies have demonstrated a link between sanctuary policies and increased crime.[14] Instead, extensive research proves that "when local law enforcement focuses on keeping communities safe, rather than becoming entangled in federal immigration enforcement efforts, communities are safer and community members stay more engaged in the local economy. This in turn brings benefits to individual households, communities, counties, and the economy."[15]

39.     Even the International Association of Chiefs of Police cautions against permitting local law enforcement to assume responsibility for immigration enforcement: "[L]ocal law enforcement should not be involved in the enforcement of civil immigration laws since such involvement would likely have a chilling effect on both [citizens and non-citizens] reporting criminal activity or assisting police in criminal investigations. . . [T]his lack of cooperation could diminish the ability of law

---

[12] Walter Ewing, *Cities with 'Sanctuary' Policies Save Lives from Domestic Violence*, Immigration Impact (June 5, 2020).
[13] *Id.*
[14] *Sanctuary Policies: An Overview*, American Immigration Council (December 2020).
[15] Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Center for American Progress (Jan. 26, 2017).

enforcement agencies to effectively police their communities and protect the public they serve."[16]

40.     Economic research demonstrates that Sanctuary City policies provide an economic benefit to U.S. Citizens and people who are undocumented. "[I]mmigrant-inclusive policies [like Sanctuary City laws] have positive effects on the local economy and can contribute to reversing economic decline."[17]

41.     Median household annual income is, on average, $4,353 higher in sanctuary counties compared to non-sanctuary counties. This holds true for white, Black, and Latine households.[18]  The poverty rate is 2.3 percent lower, on average, in sanctuary counties compared to non-sanctuary counties. Unemployment is, on average, 1.1 percent lower in sanctuary counties compared to non-sanctuary counties.

42.     One study posits that Sanctuary City policies provide economic benefits across racial lines because "sanctuary counties are keeping families together—and when households remain intact and individuals can continue contributing, this strengthens local economies."[19]

---

[16] Yuki Otsu, *Sanctuary Cities and Crime*, 192 J Econ. Behav. & Org. 600, 601-602 (2021).
[17] In Kwon Park et. al., *The effects of 'sanctuary city' policies on the local economy*, 27 Int'l J. Urb. Sci. 19 (2022).
[18] Tom K. Wong, *The Effects of Sanctuary Policies on Crime and the Economy*, Center for American Progress (Jan. 26, 2017).
[19] *Id.*

C.   **Federal Immigration Authorities have Long Targeted the Sanctuary Movement**

43.   During the early 1980s, hundreds of thousands of Central Americans arrived in the U.S. seeking asylum from brutal civil wars, severe political repression, mass killings, and other forms of extreme violence. Despite the enactment of the 1980 Refugee Act, which provided for humanitarian protection to individuals fleeing these types of conditions, ICE's predecessor, the Department of Justice Immigration and Naturalization Service (INS), specifically targeted Central American refugees for deportation. Viewing these actions as immoral, racist, and motivated by the U.S.' backing of military regimes in Central America, communities across the country responded in what would become the Sanctuary Movement.[20]

44.   Calling themselves "sanctuaries," communities and houses of worship began building networks of support to assist the growing number of refugees. They opened their doors to provide physical shelter, as well as food, medical care, employment, and legal representation within their sacred spaces. They spoke out about the immorality of U.S. immigration policy and partnered with families to highlight the hardship each had faced. By 1985, the Sanctuary Movement had grown to over 500 member sites across the United States.[21] By the mid-1980s, the INS retaliated against Sanctuary Movement members in full force, hoping to "disband" what they viewed as a modern "underground railroad" by sending paid informants to

---

[20]  *See* Gary MacEoin, *Sanctuary: A Resource Guide for Understanding and Participating in the Central American Refugees' Struggle* 14 (G. MacEoin ed., 1985).
[21]  Puck Lo, *Inside the New Sanctuary Movement That's Protecting Immigrants From ICE*, The Nation (May 6, 2015).

infiltrate, record, and monitor them under "Operation Sojourner."[22] These undercover agents, posing as congregants and clergy, attended and taped worship services and other church gatherings and documented license plate numbers, which culminated in a series of high-profile show trials in Texas and Arizona, also known as the "Sanctuary Trials."[23] Legal scholars at the time criticized this disturbing phenomenon as part and parcel of a "spotty American tradition of subjecting supposedly treasonous political and social movements to ordeals of harassment and prosecution."[24] While these prosecutions resulted in the felony convictions of eight sanctuary leaders, none of the eight ended up serving time in jail.[25]

45.    The 1980s Sanctuary Movement galvanized public outrage over the government's wrongful retaliation against asylum seekers, giving rise to landmark legislation and court decisions. In 1990, Congress passed legislation allowing for Temporary Protected Status for immigrants from certain countries. The following year, the settlement agreement in A*merican Baptist Churches v. Thornburgh* resulted in stays of removal and new asylum procedures that allowed many Salvadorans and Guatemalans to remain in the U.S.[26] In 1997, Congress passed The Nicaraguan Adjustment and Central American Relief Act, which allowed for the

---

[22] Kristina M. Cambell, *Operation Sojourner: The Government Infiltration of the Sanctuary Movement in the 1980's and its Legacy on the Modern Central American Refugee Crisis*, 13(3) Univ. St. Thomas. L.J. 474, 480 (2017).

[23] *Id.* at 480-482.

[24] *Id.* at 384; *see also* Peter Applebome, *Sanctuary Movement: New Hopes After Trial*, N.Y. Times (May 6, 1986).

[25]  Barbara Bezdek, Religious *Outlaws: Narratives of Legality and the Politics of Citizen Interpretation,* 62 TENN. L. REV. 899, 906 n.21 (1994-1995).

[26] *American Baptist Churches v. Thornburgh*, 760 F. Supp. 796 (N.D. Cal. 1991).

suspension or cancellation of removal for many asylum seekers from Central America and former Soviet bloc countries.

46.     The Sanctuary Movement reignited in the 2000s, and their advocacy and actions have spurred legislative changes at the local and state levels, as localities have adopted "sanctuary" measures to welcome and protect immigrant residents.[27]

**D.     The U.S. Government Has a Long History of Violating the First Amendment Rights of Social Movement Organizations that Advocate for Progressive Social Change and Critique the State**

47.     In the late 1960s, FBI Director J. Edgar Hoover used FBI agents to infiltrate and undermine Black organizations and spy on and discredit individual leaders who were part of the Civil Rights Movement–including the Black Panther Party. Federal documents reveal that the U.S. government, often in coordination with local law enforcement, unlawfully engaged in various strategies designed to "neutralize the BPP as a political voice on racial issues." *Hampton v. Hanrahan*, 600 F.2d 600, 624 (7th Cir. 1979), *cert. granted in part, judgment rev'd in part,* 446 U.S. 754 (1980).

48.     During the height of the Civil Rights Movement, the states of Alabama and Virginia attempted to use administrative regulation and criminal law to target the NAACP and prevent the organization from engaging in advocacy aimed at redressing racial discrimination, and more specifically advocacy aimed at each state's racially discriminatory laws and practices. In each instance, the state's

---

[27] *See, e.g.*, Christopher N. Lasch et al., *Understanding "Sanctuary Cities*," 59 B.C.L. REV. 1703 (2018).

regulatory attempts were motivated by animus towards the NAACP's advocacy and were invalidated by the U.S. Supreme Court on First Amendment grounds. *See N*at'l *Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 435–36 (1963) (challenging Virginia's prohibitions related to litigation and legal work); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958) (challenging Alabama's attempts to regulate the NAACP through means that would put its membership at risk and frustrate the organization's goals").

49.     In Chicago, a coalition of social justice organizations sued federal and local law enforcement, alleging that the defendants subjected the Coalition to intrusive surveillance without a legitimate law enforcement purpose. After the court found that the Coalition stated First Amendment violations, the parties resolved this case through settlement. *Alliance to End Repression v. Chicago*, 561 F. Supp. 537,540 (N.D. Ill. 1982).

### E.    Defendants' Chicago-Based Immigration Raids Are Aimed At Destroying The Plaintiff's Sanctuary City Advocacy And Movement Work

50.     Trump's animosity towards Chicagoans' support for Sanctuary City policies is long-standing and well-documented.

51.     In October 2019, speaking in Chicago, Trump criticized Chicago's stance towards immigrants, stating that "Chicago is, unfortunately, the worst sanctuary city in America. Chicago protects criminals at a level few could even imagine."[28]

---

[28] Remarks at the International Association of Chiefs of Police Annual Conference, Trump White House Archive (Oct. 28, 2019).

52.     Despite the Seventh Circuit's holding that, under current law, the Department of Justice has no authority to withhold funds from Sanctuary Cities, Trump has promised to strip federal funds from Chicago and other sanctuary cities again this term to coerce cities to comply with his immigration agenda.[29]

53.     Project 2025, the blueprint for the Trump Administration, further affirms its hostility to the Sanctuary City Movement with references to immigration enforcement that has been hobbled by "Left's wokeness and weaponization against Americans whom the Left perceives as its political opponents."[30] This transition plan reflects an intent to withhold federal funding from local jurisdictions that do not participate in immigration enforcement[31] and to require ICE to enforce immigration law against immigrants who participate in "civil disobedience" even in the absence of a warrant.[32]

54.     In the days and weeks before the inauguration, Trump and other officials repeatedly affirmed their intention to target Chicago with sweeping immigration raids.[33] Trump's immigration czar Tom Homan pledged that immigration enforcement would "start right here in Chicago."[34]

---

[29] Heather Cherone, *As Donald Trump Takes Office, Chicago Officials Prepare to Push Back on His Agenda*, WTTW ( Jan. 20, 2025).
[30] Ken Cuccinelli, *The Common Defense: Department of Homeland Security* 135 (Project 2025, The Heritage Foundation 2024).
[31] *Id*. at 150.
[32] *Id*. at 141.
[33] Joe Barrett, Michelle Hackman, & Paul Kiernan, *Trump to Begin Large-Scale Deportations Tuesday*, Wall Street Journal (Jan. 17, 2025).
[34] Josh Marcus, *Trump's first major deportation effort will hit Chicago, says Report*, The Independent (Jan. 18, 2025).

55. The Washington Post also reported on November 26, 2024, that members of the President's circle involved in planning for Sanctuary City crackdowns believed that "Chicago is going to be made an example of."[35]

56. The Wall Street Journal documented the Trump administration's intent to target Plaintiffs' communities and the Sanctuary City Movement in Chicago: "The transition team had been contemplating cities to target in a day-one operation as a way of making an example of so-called sanctuary cities, which adopt policies limiting cooperation with federal immigration authorities. They settled on Chicago both because of the large number of immigrants who could be possible targets and because of the Trump team's high-profile feud with the city's Democratic Mayor Brandon Johnson."[36]

F. **Immigration Raids Create Widespread Harm That Devastates Entire Communities-Including U.S. Citizens.**

57. Immigration raids pose immediate, severe, and long-lasting harm to individuals. These harms are not limited to people against whom ICE initiates immigration proceedings. Immigration raids lead to individual and family trauma, economic devastation, educational system disruption, and public health and safety crises.

58. Thirty-seven percent of Illinois undocumented families have at least one child who is a U.S. Citizen and who is under the age of 18.[37] Approximately 70%

---

[35] Jacob Bogage & Jeff Stein, *Trump team eyes funding showdown with 'sanctuary cities' over immigration,* Washington Post (Nov. 26, 2024).

[36] Barrett, *supra*.

[37] *Profile of the Unauthorized Population; Illinois*, Migration Policy Institute.

of people who are undocumented live in "mixed-status" families, meaning that the family includes both undocumented immigrants and U.S. citizens.[38] Of the 22 million people in households with an unauthorized immigrant, 11 million are U.S. born or lawful immigrants, including: 1.3 million U.S.-born adults who are children of unauthorized immigrants, and 1.4 million other U.S.-born adults and 3.0 million lawful immigrant adults.[39]

G.     **Raids are likely to ensnare U.S. citizens and violate the Fourth Amendment rights of those targeted**

59.     In its intention to "make an example of Chicago" and in promising an unprecedented wave of mass deportations, the federal government will flood Chicago with officers and arrest and detain in large numbers to continue fostering its campaign of intimidation and fear toward the Sanctuary City Movement. Arrests and detentions that are not in accordance with ICE's own regulations are a practical certainty.

60.     U.S. citizens have been wrongfully arrested for immigration purposes in recent years. Indeed, a 2021 report from the Government Accountability Office (GAO) indicates that "ICE arrested 674, detained 121, and removed 70 potential U.S. citizens from fiscal year 2015 through the second quarter of fiscal year 2020."[40] The GAO noted that "ICE guidance [on investigating citizenship] is inconsistent and ICE

---

[38] Jeffrey S. Passel & Jens Manuel Krogstad, *What we know about unauthorized immigrant living in the U.S.*, Pew Research Center (Jul. 22, 2024).

[39] *Id.*

[40] U.S Government Accountability Office, Immigration Enforcement:
Actions Needed to Better Track Cases Involving U.S. Citizenship Investigations,
https://www.gao.gov/products/gao-21-487.

does not systematically track these encounters."[41] For example, in the ICE raid just yesterday, on January 23, 2025, in the Sanctuary City of Newark, New Jersey, also targeted by Defendants, citizens were detained and "terrorized" including a U.S. military veteran.[42]

61.     ICE has also issued immigration detainers to local law enforcement that resulted in wrongful arrests. *See e.g.*, *Galarza v. Szalcyk*, 745 F.3d 634, 636, 638 (finding that a Latino U.S. citizen was wrongfully held in custody under an immigration detainer for several days after he posted bail); *Creedle v. Miami-Dade Cty.*, 349 F. Supp. 3d 1276 (S.D. Fla. 2018); *Brown v. Ramsay*, Case No. 4:18-cv-10279, S.D. Fla. (2018). Studies conducted in Miami-Dade County in Florida and Travis County in Texas indicate that ICE frequently issues detainers erroneously.[43] In one case, the CATO Institute reported that "ICE detained [a man] in Texas for almost two years while he attempted to prove his derivative citizenship claim."[44]

62.     Many of these wrongful arrests occurred because ICE relies on flawed databases that are not necessarily accurate or updated as citizenship status changes for the assessment of citizenship. Indeed, ICE's databases came under scrutiny in *Gonzalez v. ICE*, 416 F. Supp. 3d 995 (C.D. Cal. 2019). There the court pointed out that "the aggregation of information ICE receives from [its] databases is largely

---

[41] *Id.*

[42] Ali Bauman, *Newark mayor says business raided by ICE agents, multiple people detained*, CBS News N.Y. (Jan. 24, 2025),

[43] Jerry Iannelli, *ICE Issued False Deportation Requests for 420 U.S. Citizens, in Miami-Dade, ACLU Reports*, Miami New Times (Mar. 20, 2019);David J. Bier, *U.S. Citizens Targeted by ICE: U.S. Citizens Targeted by Immigration and Customs Enforcement in Texas*, Cato Institute (Aug. 29, 2018) ("applying the rate of wrongful detainers in Travis County to all detainers in the state of Texas from 2006 to 2017 implies that ICE wrongfully placed detainers on at least 3,506 U.S. citizens statewide.).

[44] *Id.*

22

erroneous and fails to capture certain complexities and nuances of immigration law."
*Id.* at 1011. Given ICE's long track record of arresting, detaining, and even deporting
U.S. citizens, it is likely the planned raids will sweep up citizens.

63.     Chicago is home to one of the largest communities of Latin American
immigrants in the country. A 2005 report from the University of Notre Dame noted
that Latine people made up 20% of the Chicagoland population in 2004, numbering
more than a million people and that approximately 20,000 Latine immigrants,
primarily from Mexico, arrived in the City each year.[45] In 2014, demographic
research estimated that Latin American immigrants made up 85% of undocumented
immigrants in Chicago, as opposed to a 6% share for European immigrants.[46] ICE
disproportionately targets Latine people for immigration enforcement.[47] For example,
an expert report submitted in *City of South Miami v. Desantis*, Case No. 19-CV-
22927, S.D. Fla. (2019) explains that "persons from South and Latin America and the
Caribbean comprised 76.4 percent of undocumented immigrants, but 93.4 percent of
480,987 ICE arrests from FY 2015 to May 2018."[48] Clearly, the planned raids will
disproportionately impact racial and national origin minorities as intended by
Defendants.

---

[45] Allen Brown-Gort and Timothy Ready, *The State of Latino Chicago: This is Home Now*, Notre Dame
Institute for Latino Studies (2005).
[46] Fred Tsao, *Illinois' Undocumented Immigrant Population: A Summary of Recent Research by Rob
Paral and Associates*, Illinois Coalition for Immigrant and Refugee Rights (2014).
[47] *See*, *e.g.*, David Scott FitzGerald, Gustavo López, and Angela Y. McClean, *Mexican Immigrants
Face Threats to Civil Rights and Increased Social Hostility*, Center for Comparative Immigration
Studies University of California, San Diego (Feb. 28, 2019).
[48] *Miami et. al. v. DeSantis et. al.*,(19-cv-2297)(S.D. Fla), Expert Report of Dr. Allan J. Lichtman.

**H.      Raids cause myriad harms where they are effectuated**

**1.  Trauma Imposed on Children and Families**

64.      The planned immigration raids will impose significant harm on the children living in immigrant communities regardless of immigration status. Immigration raids instill pervasive fear and anxiety, spanning community-wide in immigrant neighborhoods. Children, neighbors, and other witnesses of immigration-related arrests experience trauma, often leaving intergenerational effects.

65.      Children and adolescents are more susceptible to experiencing mental health problems following a parent's deportation or detention.[49] The sudden separation from their parents or fear of deportation causes children to suffer from toxic stress, increasing their risk of developing chronic mental health challenges including depression, post-traumatic stress disorder, suicidal ideation, substance use, and aggression.[50]

66.      Children of parents in removal proceedings also become more likely to suffer from physical health conditions including cancer, stroke, diabetes, and heart disease.[51] Immigration enforcement may even increase the risk to children's health before birth, including potentially fatal neonatal complications.[52]

---

[49] *Fact Sheet: U.S. Citizen Children Impacted by Immigration Enforcement*, American Immigration Council (June 24, 2021).

[50] *Id.*

[51] *Fact Sheet: U.S. Citizen Children Impacted by Immigration Enforcement*, American Immigration Council (June 24, 2021).

[52] *Id.*

67.     Immigration enforcement harms students' well-being and leads to academic discrepancies among students.[53] Students afraid for their loved ones in proceedings tend to become chronically absent and decline in their academic performance.[54] "The parents' detentions or removals force parents to be less engaged in their children's education.[55] Consequently, students cannot take full advantage of the academic, behavioral, or social skills that parents would otherwise be able to offer.[56]

68.     Many early care and education workers expressed anxiety and concern in response to changing immigration policy during the first Trump Administration. One study conducted during the Trump Administration found that childcare and early education providers were struggling to support children and families who were under additional stress, including some who had experienced the detention or deportation of a parent.[57]

69.     "After a Tennessee workplace raid in April 2018 detained 97 undocumented workers, behavioral issues and substance use among local Latine students increased, including among U.S. citizen children whose families were not directly involved in the raid. Substance use disorders during the raid year were 1.5

---

[53] STILL AT RISK: THE URGENT NEED TO ADDRESS IMMIGRATION ENFORCEMENT'S HARMS TO CHILDREN, Center for Law and Social Policy (June 2023).
[54] *Fact Sheet: U.S. Citizen Children Impacted by Immigration Enforcement*, American Immigration Council (June 24, 2021).
[55] *Id.*
[56] *Id.*
[57] Immigration Policy's Harmful Impacts on Early Care and Education, Center on Law and Policy, (2018).

times above the average rate, while diagnoses of self-harm, suicide attempts, or suicidal ideation increased by 50%."[58]

70.     "Nearly half of U.S.-born Latino adolescents are concerned, at least some of the time, with the personal impacts of U.S. immigration policy, family separation caused by deportation of a loved one, and a family member being reported to an immigration office (41%). These adolescents are more likely to experience higher levels of anxiety, sleep issues, and adverse blood pressure changes. "[59]

71.     Research documents the harmful health impacts of immigration worksite raids. One study found that infants born to Latina mothers were more likely to be low birth weight than infants born to white mothers the year after an immigration raid occurred in Postville, Iowa.[60] Increased risk of low birth rates was observed for USA-born and immigrant Latina mothers. These findings highlighted the post-immigration raid implications of racialized stressors not only for the health of Latino immigrants but also for those born in the United States.

72.     The trauma and adverse health impacts of immigration affect significantly more people than those arrested. As explained by former ICE Director John Morton, unrestricted arrests in sensitive locations harm the larger community,

---

[58] *Id.*

[59] *Id.*

[60] Arline T Geronimus, and Aresha M Martinez-Cardoso, and Nicole L Novak, *Change in birth outcomes among infants born to Latina mothers after a major immigration raid*, Int J Epidemiol, 2017 Jun.

resulting in "people with contagious diseases too scared to go to the hospital or children going uneducated[.]"[61]

## 2. Economic devastation in immigrant communities and generally

73.     Immigration raids generate a pervasive climate of fear among immigrant communities, causing affected individuals to avoid public spaces, reduce shopping trips, and limit other forms of local economic participation.[62] As a result, small businesses—particularly those serving immigrant neighborhoods—experience sudden downturns, decreased revenue, and, in some cases, closures.[63]

74.     Removing half a million immigrants from the labor market due to enforcement reduces employment among U.S.-born individuals by approximately 44,000.[64] Additionally, instead of driving local wages up, immigration enforcement is associated with downward pressure on wages for most Americans as jobs are lost and the economy contracts.[65]

75.     Raids and the ensuing labor instability jeopardize vital sectors of Chicago's economy, including hospitality, manufacturing, and service industries—

---

[61] Trump plans to scrap policy restricting ICE arrests at churches, schools and hospitals, NBC NY, (Dec. 2024).

[62] Octavio Blanco, *The Economic Consequences of ICE Raids Are Far Reaching*, Marketplace (Aug. 22, 2019).

[63] Jacqueline Hagan, David Leal, and Nestor Rodriguez, *Deporting Social Capital: Implications for Immigrant Communities in the United States*, 50 Int'l Migration Rev. 282, 298-99 (2015).

[64] Chloe N. East, Philip Luck, Hani Mansour, and Andrea Velasquez, *The Labor Market Effects of Immigration Enforcement*, 41 J. Lab. Econ. 957, 958 (2023).

[65] Michael Clemens, *The Labor Market Effects of Deportations*, Peterson Inst. for Int'l Econ. (Mar. 6, 2024).

sectors that employ a large share of immigrant workers.[66] Sudden detention or deportation of employees disrupts productivity and forces employers to grapple with elevated hiring and training costs.

76. Forced family separations and sudden job losses strain Chicago's social safety net, including shelters, food pantries, and emergency assistance programs.[67] Local governments and nonprofits must divert limited resources to meet the basic needs of individuals affected by raids—needs that previously might have been covered by steady employment.[68] These costs effectively act as a hidden tax on all local residents, who bear the financial burden of replacing lost wages and stabilizing displaced families.

77. Chicago benefits significantly from immigrant entrepreneurs who launch restaurants, retail shops, and professional services that bolster the local economy and create jobs.[69] When federal raids sow fear in these communities, prospective or current immigrant business owners are less likely to invest capital, expand operations, or even register new ventures.[70] This chilling effect stifles innovation, deprives the city of additional tax revenue, and curtails a crucial source

---

[66] Alexia Elejalde-Ruiz, *No Unauthorized Immigrants? Manufacturing, Hospitality Workforces Would Struggle*, Chi. Trib. (Jan. 13, 2017).
[67] *See e.g.,* CBS Chicago, *Chicago Food Pantries Stretched Thin as They Work to Feed Asylum Seekers*, CBS News (May 30, 2023).
[68] Regina Day Langhout et al., *The Effects of Deportation on Families and Communities*, Soc'y for Cmty. Rsch. & Action (2018).
[69] Kelly Bauer, *Chicago's Immigrant Businesses Created $659 Million In Income In 1 Year, Report Says*, Block Club Chi. (Jan. 7, 2019).
[70] *Chicago Businesses Sound Alarm Over Trump's Immigration Raids*, Newsweek (Jan. 20, 2025),

of job growth, ultimately harming not just immigrant neighborhoods but all Chicago residents.[71]

I.    **Plaintiffs Are Diverting Resources from Their Primary Missions to Address the Harm Caused by the Threats of Chicago's Raids**

78.    ICE's planned raids have caused substantial concern and confusion in the communities served by ICIRR, BPNC, RTF, and OCAD. The Plaintiffs' staff have dedicated extensive time and resources towards providing emotional support to members, program participants, and constituents who fear ICE enforcement in their community. The increased need for support and reliable information about ICE activity has significantly increased the amount of time, resources, and energy that ICIRR, BPNC, and OCAD must devote to their telephone hotline service, which is jointly run and staffed by ICIRR, BPNC, and OCAD.

79.    Prior to the announcement of planned raids, the hotline primarily provided general information to community members about immigration resources and calls regarding suspected ICE activity were uncommon. However, after the announcement of the planned raids the hotline saw an increase in call volume from community members seeking information about their rights and those reporting suspected ICE activity. At times the hotline has received dozens of calls an hour regarding suspected ICE enforcement. Verifying this information takes significant

---

[71] Paul McDaniel, *Entrepreneurship and Innovation in Welcoming Cities: Lessons from Chicago, Dayton, and Nashville*, Am. Immigr. Council (Feb. 2016).

time for the Plaintiffs' staff as they attempt to differentiate between accurate versus mistaken reports. The increased need for Plaintiffs' services as a result of ICE's planned raids has caused Plaintiffs to place a hold on other projects and programming to urgently train members and new staff, meet community requests for Know Your Rights presentations, and develop other strategies to defend the rights of the communities they serve. Additionally, due to the increased calls, Organizational Plaintiffs had to make the difficult decision to discontinue the hotline service at certain times of the day because of the mental and emotional toll that call intensity was exacting on their staff.

80. Because of the staff time needed to respond to urgent requests related to ICE raids, ICIRR has shifted significant time and attention away from their core campaign work for immigrant economic justice. These campaigns include efforts to secure a state-guaranteed income program for immigrants who are not otherwise able to access public benefits. Instead of dedicating time to obtaining grant funding and building out the platform and advocacy plan for this work, ICIRR has been forced to put this work on hold to address coordination of Know Your Rights presentations, facilitation of the hotline, and volunteer training for on-the-ground rapid response teams. ICIRR expanded its support and training of rapid response teams from five groups in local communities before the announcement of potential raids to now support twelve rapid response groups around the Chicago metropolitan area. In an attempt to meet the increase in the community's need for services, the

ICIRR has sought additional funding, which in and of itself requires a substantial amount of organizational time and resources.

81.    BPNC facilitates numerous community programs, advocacy efforts, and services regarding education justice, healthcare justice, comprehensive immigration reform, community safety and violence prevention, and economic justice. In regard to these five program areas, the staff of BPNC provides services to over 7,000 Chicago residents, including direct support services in 15 neighborhood schools serving 2,000 students in school programs focused on needs like mental health, college access, and other educational needs. Because of the anticipated immigration raids, BPNC has redirected significant staff time away from these program areas to instead focus on 1) creating and implementing new policies and trainings for the organization in relation to potential ICE enforcement at BPNC locations, 2) supporting the immigration rapid response hotline, and 3) providing mental health resources focused specifically on the threat of immigration enforcement. BPNC estimates that well over 400 staff hours have been shifted from core program areas to this raid response and preparation work.

82.    While RTF's typical day-to-day work focuses on ensuring labor rights for immigrant workers and day laborers through worksite campaigns and legislative policy work, RTF's staff shifted resources drastically in response to the news of planned immigration raids. RTF staff increasingly has fielded calls from workers and organizers at the worker centers they support, and now also in the broader community, regarding what to do in the event of a workplace or home raid by ICE.

31

The legal department developed a script guide for answering these calls given the increasing need to provide quick information about people's legal rights, even though RTF typically does not support immigration casework. Legal team staff also attended a three hour Continuing Legal Education presentation regarding workplace raids, and would not have done so but for the imminent threat. In addition, in anticipation of raids, the organization moved the date of its planned worker assembly, which brings together approximately 200 worker leaders, to before the inauguration for coordination purposes. While the worker assemblies typically focus on worksite campaigns and policy goals, the discussion focused largely on planning in anticipation of targeted ICE enforcement.

83.     Prior to ICE's raid threats, OCAD had been prioritizing work such as helping members and constituents navigate housing insecurity. These activities grounded to a halt when OCAD learned of ICE's planned raids. OCAD had also been in the process of engaging in developing internal processes and procedures that it needs to operate effectively. For example, OCAD had been conducting retreats focused on internal conflict resolution skills, working to recruit new members, fundraising, and finalizing internal processes for core functions like how to conduct new hiring, as well as developing new job descriptions for future staff. However, since OCAD first learned of the planned raids in Chicago this core organizational development work has come to a halt and internal meetings around this work, including on topics such as new hiring, were canceled.

J.     **Plaintiffs Have Experienced a Chilling Effect of Their First Amendment Rights and Participation in Daily Activities Because of ICE's Planned Raids**

84.     The threat of ICE agents flooding into communities has already impacted Chicagoans and chilled their rights to freely exercise their religion and assemble.

85.     At least one church has canceled in-person Spanish-language services to protect its congregation.[72]

86.     On January 24, 2025, Secret Service agents attempted to enter a public elementary school in a predominately Latine Chicago neighborhood because an 11-year-old child reportedly posted on social media a video law enforcement regarded as "anti-Trump."[73] Federal law enforcement presence at a Chicago elementary school stowed fear in the community and concern that the Trump administration was making good on its pledge to conduct enforcement activities in schools, churches and other places.

87.     BPNC staff who work in schools have reported that since the announcement of planned raids, all of their school programs are suffering from low attendance because families are scared of potential ICE enforcement targeting their children at schools. While BPNC is focused on supporting these families, because their funding for these programs is tied to specific attendance metrics, low

---

[72] Gabe Gutierrez and Kailani Koenig, *Chicago braces for immigration crackdown and deportations under Trump*, NBC News (Jan. 20, 2025).

[73] Secret Service, Not ICE Denied Entry at Chicago School Despite Initial Reports, Francia Garcia Hernandez, Block Club Chicago, (Jan. 20, 2025)

attendance caused by the threat of ICE raids could jeopardize their ability to continue their after-school education and mental health programming.

88.     OCAD members and staff have also expressed fear that they will be targeted by ICE for their ongoing pro-immigrant advocacy. OCAD staff have also noted that since word of the planned raids got out, organization members and constituents have been racked with fear, affecting their ability to carry out daily activities, seek services that they need, and exercise First Amendment rights. For example, members have voiced fear about going to see the doctor, going to the hospital, or interacting with social workers. Members have also expressed fears about sending their children to school or attending church.

89.     RTF staff have noted that since the announcement of the planned raids, the large number of workers it serves has been in a state of sheer panic. Worker leaders that RTF supports have reported that, increasingly, immigrant day laborers do not want to speak with representatives from the worker center coalition because they are on guard for potential interrogation or covert immigration enforcement. Directors of the RTF member worker centers report fewer people coming into their offices, and that since the announcement of potential raids, more people from their communities are staying home out of fear of arrest and targeting. This climate of fear harms the organizing goals and provision of legal services and hinders immigrant workers' participation in both accessing basic services and engaging in First Amendment expression.

**K.    The Trump Administration Only has Discriminatory Justifications for Targeting Plaintiffs' Communities with Immigration Raids**

90.    Data regarding Chicago's immigrant communities and the City's decreasing crime rates demonstrate that the Trump administration has no-non-discriminatory reason for selecting Chicago as "ground zero" for immigration enforcement.

91.    The following graph demonstrates that Texas and Florida, two states with Republican governors who are hostile to the Sanctuary City Movement, have almost triple the number of undocumented people compared to Illinois. The Trump Administration has not declared these states as "ground zero for immigration enforcement" because targeting them will not harm the Sanctuary City Movement.

**Undocumented Immigrant Population Estimates by Top 10 States of Residence: 2018–2020 and 2022[74]**

| State | 2018* | 2019 | 2020 | 2022 |
|---|---|---|---|---|
| Total | 11,570,000 | 11,110,000 | 10,510,000 | 10,990,000 |
| California | 2,640,000 | 2,620,000 | 2,410,000 | 2,600,000 |
| Texas | 1,950,000 | 1,950,000 | 1,900,000 | 2,060,000 |
| Florida | 680,000 | 650,000 | 610,000 | 590,000 |
| New Jersey | 460,000 | 390,000 | 400,000 | 490,000 |
| Illinois | 460,000 | 440,000 | 370,000 | 420,000 |
| New York | 600,000 | 510,000 | 370,000 | 410,000 |
| North Carolina | 360,000 | 340,000 | 360,000 | 360,000 |
| Georgia | 390,000 | 360,000 | 360,000 | 340,000 |
| Washington | 310,000 | 330,000 | 340,000 | 340,000 |
| Arizona | 340,000 | 330,000 | 340,000 | 290,000 |
| Other or Unknown | 3,380,000 | 3,200,000 | 3,040,000 | 3,090,000 |

---

[74] Office of Homeland Security Statistics, *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2018-January 2022* (April 2024),

92.     In August 2022, the Texas Republican Governor began busing asylum seekers to Chicago. An April 2024 Chicago Tribune analysis of arrest data documents that migrants who were arrested were charged with minor infractions like traffic infractions and theft. A criminologist who evaluated the data concluded that these arrests were "certainly not a violent crime wave [instead the arrests reflect] people who are deprived of resources."

93.     This is consistent with Chicago Police Department data reflecting that crime rates in Chicago have consistently decreased over the past two years.[75]

## LEGAL CLAIMS

## COUNT I

## First Amendment

94.     Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

95.     A "fundamental principle of the First Amendment is that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys. The test for viewpoint discrimination is whether. . . the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 582 U.S. 218, 220–21 (2017).

---

[75] Chicago Police Department, CompStat Data, Jan 2025(demonstrating decreasing crime rate)

96.     Plaintiffs have advocated for and helped to sustain Chicago's status as a Sanctuary City and are leaders in the national Sanctuary City movement. They engage in widespread public education and advocacy around the implementation of Sanctuary City policies and contribute significantly to Chicago's status as a Welcoming City by supporting migrant families, helping them identify and secure resources for housing, medical care and other life necessities. Plaintiffs' Sanctuary City advocacy and movement work is protected speech and content.

97.     Defendants have pledged to launch immigration raids in the City of Chicago specifically for the purpose of ending the Plaintiffs' Sanctuary City advocacy and movement building. Defendants further intend to "make an example" of Chicago to destroy the Sanctuary City Movement across the nation.

98.     Defendants have no compelling state reason to make the Plaintiffs' communities "ground zero" for immigration enforcement.

99.     Defendants' threats and imminent plans to conduct immigration raids in Plaintiffs' communities in an effort to end the Sanctuary City Movement in Chicago and elsewhere undermines Plaintiff organizations' core missions and requires them to divert significant resources to respond to the Defendants discriminatory threats and imminent raids.

100.    Defendants' threats and imminent plans to conduct immigration raids in Plaintiffs' communities in an effort to end the Sanctuary City Movement in Chicago and elsewhere has chilled the Plaintiff organizations and their membership from fully exercising their rights to engage in speech and petition the government.

37

101.    Defendants' threats and imminent plans to conduct immigration raids in Plaintiffs' communities in an effort to end the Sanctuary City Movement in Chicago and elsewhere has affected the Plaintiffs and their members' ability to join together. A key part of Plaintiffs' activism is meeting with people of all immigration statuses to discuss and analyze shared problems and to envision collective solutions. Defendants have violated the Plaintiffs' freedom of association.

102.    Plaintiffs—each on its own behalf and on behalf of its membership, wish to continue engaging in their First Amendment-protected activities to the fullest extent possible, but, as a result of Defendants' past, present, and likely future conduct, are deterred from doing so.

**COUNT II**

**28 U.S.C. § 2201**

**Declaration of Rights**

103.    Plaintiffs incorporate each of the paragraphs of the complaint as if restated fully herein.

104.    In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought, under 28 U.S.C. § 2201.

105.    There is an actual controversy within the jurisdiction of this court. The federal government has engaged in actions endangering Plaintiffs First Amendment rights. No federal authority has agreed to stop this practice.

106.    Plaintiffs are entitled to a declaration that the acts at issue are unlawful and an injunction precluding Defendants from continuing in them.

## COUNT III

## 5 U.S.C. § 706(2)(A), (B)

## The Administrative Procedure Act

107.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

108.    The Administrative Procedure Act ("APA") directs federal courts to hold unlawful and set aside federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; or "contrary to constitutional right." 5 U.S.C. §§ 706(2)(A), (B).

109.    Defendants' policy decision to conduct immigration raids in the City of Chicago specifically for the purpose of ending the Plaintiffs' Sanctuary City advocacy and movement building constitutes final agency action.

110.    Defendants' policy decision to conduct immigration raids in the City of Chicago specifically for the purpose of ending the Plaintiffs' Sanctuary City advocacy and movement building violates the First Amendment to the United States Constitution.

111.    In its intention to "make an example of Chicago" and in promising an unprecedented wave of mass deportations, the federal government will flood Chicago with officers and arrest and detain in large numbers to continue fostering its campaign of intimidation and fear towards the Sanctuary City movement. We

anticipate arrests and detentions without sufficient basis under 8 C.F.R. § 287.7, which sets forth the various regulatory standards and procedures that ICE officers must satisfy, including regarding stops and interrogations. Defendants' policy decision will result in violations of its own regulation.

112.    Defendants' policy decision to conduct immigration raids in the City of Chicago specifically for the purpose of ending the Plaintiffs' Sanctuary City advocacy and movement building is arbitrary and capricious and otherwise not in accordance with the law, and contrary to the constitutional rights of Plaintiffs, and therefore should be held invalid and set aside under the APA.

113.    As a result of the Defendants' acts constituting violations of the APA, Plaintiffs have been harmed and aggrieved – namely, their core activities have been frustrated by Defendants' illegal actions, and they have been forced to divert substantial resources away from existing programs and core missions to address the myriad member and community needs arising from Defendants' planned enforcement. Plaintiffs' members and staff have also expressed fear that they will be targeted by ICE for their ongoing pro-immigrant advocacy.

114.    The Plaintiffs have no adequate remedy at law.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for a judgment and the following relief:

1.    A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this complaint constitute a violation of the Plaintiffs' First Amendment Rights;

2.      An injunction, pursuant to 28 U.S.C. § 2202 and 5 U.S.C. § 702, permanently enjoining the Defendants from engaging in the federal actions described in this complaint, and specifically prohibiting the Defendants from threatening and/or executing Chicago-based immigration raids for the unlawful purpose of targeting and ultimately destroying the Sanctuary City Movement; and

3.      An order setting aside the Defendants' policy to conduct immigration raids in Chicago for the unlawful purpose of targeting and ultimately destroying the Sanctuary City Movement.


Respectfully submitted:

DATED this 24th day of January 2025.

/s/ Sheila A. Bedi
Sheila A. Bedi
Eliana Green
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 E. Chicago Ave.,
8th Floor Chicago, IL 60611
Phone: 312-503-2492
Sheila.bedi@law.northwestern.edu
eliana.green@law.northwestern.edu

Sejal Zota*
Dinesh McCoy*
Daniel Werner*
Just Futures Law
1629 K Street N.W., Suite 300
Washington, DC 20006
Phone: (617) 812-2822
sejal@justfutureslaw.org
dinesh@justfutureslaw.org
daniel@justfutureslaw.org

Daniel Massoglia
MK Law, LLC
2020 Janice Avenue
Melrose Park, IL 60160
P: 312 545 8660
E: dm@mklawchicago.com

*pro hac vice* application forthcoming