IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ORGANIZED COMMUNITIES AGAINST DEPORTATIONS; BRIGHTON PARK NEIGHBORHOOD COUNCIL; ILLINOIS COALITION FOR IMMIGRANT AND REFUGEE RIGHTS; and RAISE THE FLOOR ALLIANCE, | ) ) ) ) ) ) ) | Case No. 25-cv-868 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| BENJAMINE HUFFMAN, in his official capacity Acting Secretary of the United States Department of Homeland Security; CALEB VITELLO, in his official capacity as Acting Director of Immigration and Customs Enforcement; and IMMIGRATION AND CUSTOMS ENFORCEMENT. | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

---

**PLAINTIFFS' AMENDED MOTION FOR A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER ENJOINING THE DEFENDANTS FROM CONDUCTING IMMIGRATION RAIDS IN CHICAGO INTENDED TO DESTROY THE SANCTUARY CITY MOVEMENT**

**INTRODUCTION**

The Plaintiffs are all Chicago-based organizations that provide advocacy and support to Chicago's immigrant communities. They are also leaders in the national Sanctuary City Movement, and they helped make Chicago the third-largest Sanctuary City in the United States. *See* Exhibit 1, "Declaration of Antonio Gutierrez," at ¶¶ 6-7 (hereinafter "OCAD Declaration"); Exhibit 2, "Declaration of Patrick Brosnan," at ¶ 10 (hereinafter "BPNC Declaration"); Exhibit 3, "Declaration of Fred Tsao," at ¶¶ 5-7 (hereinafter "ICIRR Declaration"); Exhibit 4, "Declaration of Sophia Zaman," at ¶¶ 9-10 (hereinafter "RTF Declaration"). This is why President Donald Trump and Defendant Benjamine Huffman, the Acting Secretary of the Department of Homeland Security (DHS), have declared Chicago "ground zero" for immigration enforcement; the federal government intends to "make an example of Chicago" and quash the Sanctuary City movement. The federal government's decision to target the Plaintiffs' communities because of its animus towards the Sanctuary City movement is a clear violation of the First Amendment. Pursuant to Rule 65 of the Fed. R. Civ. P., Plaintiffs seek a temporary restraining order and preliminary injunction that would enjoin Defendants from threatening and/or executing Chicago-based immigration raids for the unlawful purpose of targeting and ultimately destroying the Sanctuary City movement.

Preliminary injunctions are granted in extraordinary situations where there is a clear showing of need. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Cooper v. Salazar*, 196 F.3d 809 (7th Cir. 1999). The need here could not be more obvious or immediate. Plaintiffs—and the communities they represent—will be irreparably harmed by Defendants' decision to launch immigration raids aimed at snuffing out the Sanctuary City movement.

## ARGUMENT

A plaintiff seeking a preliminary injunction/temporary restraining order must show: 1) "some likelihood of succeeding on the merits," 2) "that it has 'no adequate remedy at law,'" and 3) that it "will suffer irreparable harm if preliminary relief is denied." *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992). If the moving party meets this burden, then the court must consider the harm that the nonmoving party will suffer if preliminary relief is granted—balancing such harm against the irreparable harm the moving party will suffer if relief is denied, as well as "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Id.* at 11-12.

Plaintiffs prevail on each factor, as detailed below. Success on the merits is likely because, without intervention from this Court, the federal government will violate Plaintiffs' First Amendment rights by attempting to dismantle the Sanctuary City Movement. Plaintiffs face irreparable harm because the federal government's planned Chicago raids have been designed to chill Plaintiffs' advocacy and interfere with their core functions. The balance of harms favors Plaintiffs because the protection of constitutional rights is always in the public interest. Thus, this Court should enter an emergency order to protect Plaintiffs from imminent violations of their First Amendment rights.

## I. PLAINTIFFS WILL SUCCEED ON THEIR FIRST AMENDMENT CLAIMS

In order to demonstrate a substantial likelihood of success on the merits, a plaintiff must demonstrate "a plausible claim on the merits." *Hoosier Energy Rural Elec. Co-op., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009). Courts should not "improperly equat[e] 'likelihood of success' with 'success.'" *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011) (quoting *University of Texas v. Camenisch*, 451 U.S. 390, 394 (1981)). "[T]he threshold for establishing likelihood of success is low." *Id.* A plaintiff needs "only to present a claim plausible enough that (if the other

2

preliminary injunction factors cut in their favor) the entry of a preliminary injunction would be an appropriate step." *Id.* at 783. To determine whether a plaintiff's legal argument has a likelihood of success, courts use the existing test that would be employed to decide the merits of the case. *See S./Sw. Ass'n of Realtors v. Evergreen Park, IL.*, 109 F.Supp.2d 926, 927 (N.D. Ill. 2000).

## A. Courts have Consistently Prohibited Government Officials' Targeting of Progressive Movements.

The Trump administration's animus toward the Sanctuary City movement is consistent with the long history of U.S. federal and state governments deploying police powers in an attempt to dismantle progressive movements—especially movements advocating against or critical of the state. For example, federal courts have long recognized that the federal and local governments engaged in a well-coordinated, unlawful campaign aimed at destroying the Black Panther Party. *See Hampton v. Hanrahan*, 600 F.2d 600, 622 (7th Cir. 1979), *cert. granted in part, judgment rev'd in part*, 446 U.S. 754 (1980) (recounting federal and local governments' conspiracy "designed to subvert and eliminate the Black Panther Party and its members.").[1]

During the height of the Civil Rights movement, the NAACP, which focuses on eradicating racial discrimination, opened offices in southern states where racial segregation and discrimination was pernicious. In response to the NAACP's advocacy, the states of Alabama and Virginia tried to eliminate it from their jurisdictions by imposing upon the organization an array of administrative and criminal enforcement actions. Because the U.S. Supreme Court intervened and forbade the states from

---

[1] *See also Wahad v. City of New York*, No. 75 CIV. 6203 (AKH), 1999 WL 608772, at *1 (S.D.N.Y. Aug. 12, 1999) (Plaintiff asserted First Amendment claims based on government activities targeted at interfering with the operations of the Black Panther Party, but dismissing on statute of limitations grounds); *Hull v. Petrillo*, 439 F.2d 1184, 1185 (2d Cir. 1971) (reversing trial court's dismissal of First Amendment claims where the Black Panther Party alleged local police harassed them and aimed to drive them out of the city by imposing upon them a licensing requirement related to newspaper distribution).

targeting their adversaries with unconstitutional enforcement actions, the NAACP's work continues to this day. In invalidating Virginia's enforcement scheme as applied to the NAACP, the Court made special note of the animus motivating that state's actions: "[T]he civil rights movement has engendered the intense resentment and opposition [from] Virginia. . . In such circumstances, [government action] broadly curtailing group activity. . . may easily become a weapon of oppression, however even handed its terms appear. Its mere existence could well freeze out of existence all [civil rights advocacy]." N*at'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 435–36 (1963); *Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460-61 (1958) ("it is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, . . . state action which may have the effect of curtailing [First Amendment] freedoms []is subject to the closest scrutiny."). In short, when confronted with government animosity toward progressive movements, Courts frequently order protections against impermissible First Amendment intrusion. So should the Court here.

### B. The Federal Government's Attempts to Destroy the Sanctuary City Movement by Targeting Plaintiffs' Communities with Immigration Raids Constitutes Unlawful Viewpoint Discrimination in Violation of the First Amendment

A "fundamental principle of the First Amendment is that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys. The test for viewpoint discrimination is whether. . .the government has singled out a subset of messages for disfavor based on the views expressed." *Matal v. Tam*, 582 U.S. 218, 220–21 (2017). Government action seeking to suppress the ideas or messages expressed "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The government engages in

4

unlawful viewpoint discrimination when it engages in a wide variety of enforcement actions motivated by animus toward protected First Amendment activity. *See Grosjean v. Am. Press Co.*, 297 U.S. 233, 248 (1936) ("The evils to be prevented [by the First Amendment are]. . .any action of the government by means of which it might prevent such free and general discussion of public matter.").

The Trump administration has singled out the Plaintiffs' communities for immigration raids because of the administration's animus toward the Sanctuary City Movement and its leaders. This constitutes impermissible content-based enforcement—which is presumptively unconstitutional and is only justified by a compelling state interest.

1. *Plaintiffs' Sanctuary City Advocacy and Participation in the Sanctuary City Movement is Protected First Amendment Activity*

Plaintiffs' advocacy focused on the creation and promotion of Chicago as a Sanctuary City and their leadership in the national Sanctuary City movement is protected First Amendment expression. Plaintiffs' expressive conduct in support of their movement is on the "highest rung of the hierarchy of First Amendment values and [are] entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quotation marks omitted). "Debate on public issues should be uninhibited, robust, and wide-open, and … may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Plaintiffs have long been outspoken advocates for Chicago's status as a sanctuary city. For example, OCAD and its members have participated in public advocacy around the Welcoming City Ordinance (WCO) for years. *See* OCAD Declaration at ¶¶ 6-7. In January 2025, OCAD, BPNC, ICIRR, and RTF members rallied to help defeat a weakening of the WCO proposed by some members of Chicago's City Council. *See* OCAD Declaration at ¶¶ 6-7; BPNC Declaration at ¶ 10; ICIRR

Declaration at ¶¶ 5-7. All groups and their members have been vocal in their support of Chicago's status as a sanctuary city. *See Id*; RTF Declaration at ¶¶ 9-10. [2]

Courts have long held that the First Amendment protects political beliefs and expressive conduct—like Plaintiffs' participation in the Sanctuary City movement. "Political belief and association constitute the core of those activities protected by the First Amendment." *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 69 (1990). "[I]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion. . ." *Elrod v. Burns*, 427 U.S. 347, 356 (1976)[3]. The Plaintiffs' participation in the Sanctuary City movement is thus unquestionably protected First Amendment activity.

> 2. *Trumps' Chicago-Based Immigration Raids are Animated by Animus Towards the Plaintiffs' Sanctuary City Movement and thus Constitute Unlawful Viewpoint Discrimination*

A fundamental principle of free speech law is that the "government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). "Government discrimination among viewpoints . . . is a blatant and egregious form of content discrimination." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 168 (2015). Government action impermissibly motivated by a desire to suppress a particular point of view clearly violates the First Amendment. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 811 (1985); *Grossbaum v. Indianapolis-Marion Cnty. Bldg. Auth.*, 100 F.3d 1287, 1298 (7th Cir. 1996)("Motive may thus be a vital piece of evidence that courts must use to judge the viewpoint-neutrality of the regulation."). In the

---

[2] *See also* Compl. ¶¶25-35 for descriptions of Plaintiffs' Sanctuary City movement work.
[3] *See also Adlerstein v. U.S. Customs & Border Prot.*, No. CIV 19-500-TUC-CKJ, 2020 WL 5846600, at *12 (D. Ariz. Oct. 1, 2020) (concluding that "associating with migrants and advocates and ... engaging in political speech" are protected activity); *Dousa v. U.S. Dep't of Homeland Sec.*, 662 F. Supp. 3d 1123, 1149 (S.D. Cal. 2023) (same).

First Amendment context, a government actor's animus against speech or political expression can transform an otherwise legitimate government act into a First Amendment violation. *Anderson v. Davila,* 125 F.3d 148, 160–61 (3d Cir. 1997). As described in detail below, the words of President Trump and members of his administration make his motive in targeting Chicago with immigration raids crystal clear: he intends to use these raids to destroy the Plaintiffs' Sanctuary City movement.

### a. Evidence of Trump's Sanctuary City Animus

Trump and members of his administration direct unequivocal and well-documented animus towards the Plaintiffs' Sanctuary City Movement work. As far back as October 2019, while speaking in Chicago, Trump criticized Chicago's stance towards immigrants, making the baseless claim that "Chicago is, unfortunately, the worst sanctuary city in America. Chicago protects criminals at a level few could even imagine."[4] The Washington Post also reported on November 26, 2024, that members of the president's circle involved in planning for Sanctuary City crackdowns would "make an example out of Chicago."[5] These allegations sufficiently demonstrate that the federal government planned the Chicago immigration raids not to further any compelling governmental interest but instead to punish the Plaintiffs for their Sanctuary City-related advocacy.[6]

### b. Trump's Imminent Chicago-based Immigration Raids and Related Threats Constitute Violations of the First Amendment

---

[4] Remarks at the International Association of Chiefs of Police Annual Conference, Trump White House Archive (Oct. 28, 2019).
[5] Jacob Bogage & Jeff Stein, *Trump team eyes funding showdown with 'sanctuary cities' over immigration,* The Washington Post (Nov. 26, 2024); Michelle Hackman et. al., *Trump to Begin Large-Scale Deportations on Tuesday,* The Wall Street Journal (Jan. 17, 2025)(Officials selected immigration raid target cities "as a way of making an example of so-called sanctuary cities" and "settled on Chicago both because of the large number of immigrants who could be possible targets and because of the Trump team's high-profile feud with the city's Democratic (and Sanctuary City supporter) Mayor Brandon Johnson."
[6] *See* Compl. ¶¶ 50-56 for allegations relating to the Trump Administration's animus towards the Sanctuary City movement; *see also* Exhibit 5, "Declaration of Plaintiffs' Representatives," focusing on the impact of these statements on Plaintiffs and their members, communities, and constituents.

Governments cannot take adverse action "when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). The government's "threat of invoking legal sanctions and other means of coercion to achieve the suppression of disfavored speech violates the First Amendment." *Nat'l Rifle Ass'n of Am. v. Vullo,* 602 U.S. 175, 180 (2024). "Government officials cannot attempt to . . .punish or suppress views that the government disfavors." *Id.* Courts routinely constrain government action on First Amendment grounds in situations where government officials take action that—on the surface—is unrelated to the regulation of speech. And even the Federal Government's discretionary decisions are unconstitutional if motivated by viewpoint discrimination.

In *Cornelius v. NAACP Legal Def. & Educ. Fund*, Inc., 473 U.S. 788, 812 (1985), the NAACP Legal Defense Fund and other advocacy groups challenged the federal government's decision to exclude them from a charity campaign aimed at federal workers. The federal government justified the exclusion by asserting that the groups were controversial, and their inclusion could cause conflict in the federal workplace. The Supreme Court warned that a pretextual justification for excluding the groups because the government disagreed with their messages would run afoul of the First Amendment. *Id.* at 811 (the government's interest in maintaining a controversy-free workplace "will not save a regulation that is in reality a facade for viewpoint-based discrimination.").

Put another way, the government is prohibited from using the regulatory and enforcement schemes it controls to target and silence its critics. Courts routinely find that law enforcement action motivated by animus against expressive conduct violates the First Amendment—including in

immigration-related enforcement actions.[7] In *Doe v. Johnson*, No. 15-CV-01387, 2016 WL 861240, at *1 (N.D. Ill. Mar. 7, 2016), a Plaintiff alleged that USCIS denied his petition for immigration relief because of the agency's animus towards the Plaintiff developed after he filed a lawsuit against the federal government. The district court found these allegations sufficient to defeat a Motion to Dismiss. In *Dousa v. U.S. Dep't of Homeland Sec.*, 662 F. Supp. 3d 1123, 1149 (S.D. Cal. 2023), the Plaintiff provided ministry to immigrants and made frequent speeches critical of U.S. immigration policy. After surveilling the plaintiff, who had Global Entry and frequently traveled back and forth to Mexico, the U.S. Government sent an email to officials in Mexico requesting that the Plaintiff be "denied entry to Mexico and be sent back to the United States." The U.S. government's email— motivated by its animus towards the plaintiff's immigration advocacy—constituted a First Amendment violation. 662 F. Supp. 3d 1123 at 1150.[8]

Plaintiffs have demonstrated each requirement required to succeed on their claim that the Trump Administration is targeting the Plaintiffs' communities for immigration enforcement because of its animus towards the Sanctuary City Movement. The Trump Administration's goals could not

---

[7] The test for evaluating a First Amendment retaliation claim differs from this analysis--it requires an inquiry into whether the plaintiff suffered a deprivation that would deter future First Amendment expression and whether the plaintiff's First Amendment activity was a motivating factor in the government's retaliatory action. *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008). While Plaintiffs here assert a viewpoint discrimination claim, case law from the retaliation context sheds some light on the types of governmental action that Courts have found to constitute a First Amendment violation.

[8] *See* also, *Doss v. Young*, No. SA-11-CA-116-FB, 2011 WL 13235041, at *2 (W.D. Tex. July 5, 2011), report and recommendation adopted, *Doss* No. CV SA-11-CA-116-FB, 2011 WL 13237778 (W.D. Tex. Sept. 1, 2011) (Plaintiff, who alleged that law enforcement targeted their business for raids after plaintiff refused to plead guilty to an administrative violation sufficiently alleged First Amendment claim); *Surita v. Hyde*, 665 F.3d 860, 877 (7th Cir. 2011) (a police department's actions in requiring a higher assembly fee for protestors advocating against, rather than for, a proposed towing ordinance was found to constitute impermissible viewpoint discrimination.); *Akindes v. City of Kenosha*, No. 20-CV-1353-JPS-JPS, 2021 WL 4482838 (E.D. Wisc. Sept. 30, 2021) (Plaintiffs stated a First Amendment claim where they alleged that police enforced a curfew and arrested protestors of police brutality, but not counter-protestors who violated the same curfew law).

be more explicit: it intends to "end" the Sanctuary City Movement and will use immigration raids to target Plaintiffs' vibrant, courageous advocacy that has made Chicago "ground zero" for this Administration's war against the Sanctuary City Movement.

As noted by the Seventh Circuit in a case finding that a Vietnam war era draft dodger alleged a First Amendment claim: "[a]n enforcement procedure that focuses upon the vocal offender is inherently suspect since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right." *United States v. Falk*, 479 F.2d 616, 621 (7th Cir. 1973). Few organizations have been more vocal than the Plaintiffs in their support of Sanctuary City policies. And few communities have offered more robust support for Sanctuary City policies than Chicago. The Federal Government's planned raids are an unlawful scheme to punish the Plaintiffs for this advocacy and must therefore be enjoined.

### c. Defendants' Planned Chicago-based Immigration Raids are not Narrowly Tailored to meet a Compelling Governmental Interest

Government action aimed at suppressing specific content or expressive activity is "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 155 (2015). The government cannot make that showing here.

There is no evidence that sending federal law enforcement to blanket Chicago's immigrant communities will improve national security, reduce crime, or otherwise make Chicago or the United States safer and healthier. To the contrary, targeting undocumented immigrants with indiscriminate raids will create worse health, economy and public safety outcomes for all.[9] Trump's attempts to

---

[9] *See* Compl.¶¶ 37-42 for a description of the community-wide benefits of Sanctuary City policies, *compare with Id.*¶¶ 57-77 for allegations regarding the harm imposed on communities in the wake of immigration raids.

correlate immigration status and public safety are defeated with a careful examination of all available data. A National Institute of Justice Study concluded that "among the foreign-born, undocumented immigrants have the least serious criminal records."[10] A 2023 study concluded that U.S. born white people are 30% more likely to be incarcerated than immigrants.[11] Further, many other cities have more undocumented residents than Chicago.[12]

The Federal Government cannot justify its animus towards the Sanctuary City Movement by relying on public safety or national security related justifications. Sanctuary Cities are proven to be far safer than cities without these protections. *See* Compl.¶¶ 37-42 (there are significantly fewer crimes in jurisdictions with sanctuary city polices).

Indeed, as other courts have noted, a "rote invocation of harm to 'national security interests' [is not] the silver bullet that defeats all other asserted injuries." *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 603 (4th Cir. 2017), *as amended (May 31, 2017), as amended (June 15, 2017), vacated and remanded sub nom. Trump v. Int'l Refugee Assistance*, 583 U.S. 912 (2017) (citing *United States v. Robel*, 389 U.S. 258, 264 (1967) ("Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart. . .and the most cherished of those ideals have found expression in the First Amendment. It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties ... which makes the defense of the Nation worthwhile.").

---

[10] Michael T. Light, *Unauthorized Immigration, Crime and Recidivism: Evidence from Texas*, National Institute of Justice, (2022).

[11] Elisa Jácome, *et al, Law-Abiding Immigrants: The Incarceration Gap Between Immigrants and the U.S.-born, 1850–2020*, National Bureau of Economic Research, (July 2023).

[12] Jeffrey Passel & D'vera Cohn, *20 metro areas are home to six-in-ten unauthorized immigrants in U.S.*, Pew Research Center, (Mar. 11, 2019).

## II.    PLAINTIFFS HAVE NO ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE, NON-SPECULATIVE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

Defendants intend to bombard the Plaintiffs' communities with hundreds of federal law enforcement officers to end the Sanctuary City movement. Not only will this effort violate the Plaintiffs' First Amendment rights, it also puts Plaintiffs' communities at serious risk of harm to familial interests, economic well-being, health, and liberty. No amount of money damages will relieve Plaintiffs from the harm incurred by Defendants' actions here. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (holding that loss of First Amendment freedoms presumptively constitutes irreparable injury "for which money damages are not adequate").

As a result of the anticipated raids, Plaintiffs have experienced decreased participation in their programming in the community, as immigrant community members have foregone attending in fear of potential arrest and detention.[13] In addition, Plaintiffs have expended time and resources to respond to urgent questions from community members about the risks of being targeted for immigration enforcement during daily activities like attending school, doctors' appointments, and church services.[14] This constitutes irreparable harm sufficient to warrant a preliminary injunction. *Higher Soc'y of Indiana v. Tippecanoe Cty., Indiana*, 858 F.3d 1113, 1116 (7th Cir 2017) ("even short deprivations of First Amendment rights constitute irreparable harm"); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss

---

[13] *See* Compl. ¶¶ 84-89 for allegations related to the chilling effect Defendants' actions imposed on the Plaintiffs including, members fear of associating in groups, speaking out about immigration policy and organizing for improved working conditions; *see also* OCAD Declaration at ¶¶ 16-17; BPNC Declaration at ¶¶ 15-16; ICIRR Declaration at ¶ 11; RTF Declaration at ¶¶ 15-16.

[14] *See* Compl. ¶¶ 78-89 for allegations of the organizational and First Amendment harms suffered by the Plaintiffs, including modifying planned programming to address responses and plans for immigration raids in workplaces, activating immigrant defense rapid response networks and supports in lieu of continuing with their affirmative advocacy on matters central to their mission; *see also* OCAD Declaration at ¶¶ 16, 8-11; BPNC Declaration at ¶¶ 6-7, 11-15; ICIRR Declaration at ¶¶ 8-11; RTF Declaration at ¶¶ 11-16.

of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").[15]

Further, the fact that Defendants have not yet launched immigration raids in Chicago poses no bar to relief and does not mitigate the irreparable harm imposed upon Plaintiffs' First Amendment Rights. "The Supreme Court has often noted that a realistic threat of arrest is enough to chill First Amendment rights." *City of Houston, Texas v. Hill*, 482 U.S. 451, 459 n.7 (1987).[16]

## III.     THE BALANCE OF HARMS FAVORS THE ENTRY OF A PRELIMINARY INJUNCTION

"Injunctions protecting First Amendment freedoms are always in the public interest." *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) (upholding preliminary injunction where state university revoked the student organization status of a religious student group); *Am. C.L. Union of Illinois v. Alvarez,* 679 F.3d 583, 590 (7th Cir. 2012) ("the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional"). Plaintiffs have clearly demonstrated they are suffering a violation of their First Amendment Rights. Relief ordered by this

---

[15] *See also Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012) (same); *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest.").

[16] *Hodgkins ex rel. Hodgkins v. Peterson,* 355 F.3d 1048, 1056 (7th Cir. 2004) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest. . .and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief."); *Kole v. Vill. of Norridge,* No. 11 C 3871, 2017 WL 5128989, at *7 (N.D. Ill. Nov. 6, 2017) (Plaintiffs had standing to challenge an ordinance even when the law had never been applied to them because the threat of enforcement was "hardly speculative."); *Majors v. Abell,* 317 F.3d 719, 721 (7th Cir. 2003) (A pre-enforcement plaintiff "need not show that the authorities have threatened to prosecute him" because "the threat is latent in the existence of the statute."); *Schirmer v. Nagode,* 621 F.3d 581, 586 (7th Cir. 2010) ( a person need not risk arrest before bringing a pre-enforcement challenge under the First Amendment....") (citing *Holder v. Humanitarian Law Project,* 561 U.S. 1, 130 S. Ct. 2705, 2717 (2010)); *Am. Civ. Liberties Union of Illinois v. Alvarez,* 679 F.3d 583, 590–91 (7th Cir. 2012).

Court to cure these violations will re-balance the harms suffered by the Plaintiffs and further the public interest.[17]

## IV.    THE COURT HAS AUTHORITY TO GRANT THIS RELIEF

### A. Executive Discretion Does Not Shield the Defendants from Liability for Unconstitutional Acts

Importantly, Plaintiffs here do not challenge the Federal Government's authority to commence any individual immigration enforcement proceedings. Instead, the challenge is focused on the federal government's unconstitutional policy decision to raid the City of Chicago because of its animus towards the Sanctuary City movement and to deter Plaintiffs from further Sanctuary City advocacy. Federal courts routinely constrain the Defendants from engaging in analogous constitutional violations. *See Nava v. Dep't of Homeland Sec.,* 435 F. Supp. 3d 880, 890 (N.D. Ill. 2020) (permitting plaintiffs to proceed on claims alleging that ICE "made traffic stops based solely on race-based assumptions that drivers and passengers were non-citizens, in violation of the Fourth Amendment."); *City of Chicago v. Sessions,* 321 F.Supp.3d 855, 872 (N.D. Ill. 2018)(granting a permanent injunction to the City of Chicago after finding that statute governing communication between government agencies and ICE violated the Tenth Amendment on its face).[18]

---

[17] The final requirement for emergency relief—related to bond is inapplicable here because Plaintiff's requested relief will not impose any financial burden on the Defendants, it is in the public interest, and the injunction is necessary to vindicate constitutional rights. *See Habitat Educ. Ctr v. U.S. Forest Serv.,* 607 F.3d 453, 458 (7th Cir. 2010) (where there is no danger that the opposing party will incur any damages from the injunction," then the court may dispense with the bond); *Davis v. Mineta,* 302 F.3d 1104, 1126 (10th Cir. 2002) ("minimal bond amount should be considered" in public interest case); *Complete Angler, L.L.C. v. City of Clearwater,* 607 F.Supp.2d 1326, 1335 (M.D. Fla. 2009) ("Waiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right.").

[18] *See also Kidd. v. Mayorkas,* 734 F. Supp.3d 967 (C.D. Cal. 2024) (court granted Plaintiffs' summary judgment after finding that ICE's "system-wide policies and practices of entering the curtilage of homes for the purpose of arresting the occupant violate the Fourth Amendment"); *Saget v. Trump,* 375 F. Supp.3d 280 (E.D.N.Y 2019) (granting a preliminary injunction to Plaintiffs after finding that evidence showed that the discriminatory purpose of removing non-white immigrants from the United States was a motivating factor behind the decision to terminate Temporary Protected Status for Haitians).

While the executive branch exercises broad power over immigration, the executive cannot selectively enforce laws in a way that violates the Constitution, and so this Court can and should order the relief the Plaintiff's seek. *United States v. Batchelder*, 442 U.S. 114, 125 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints."); *see also Wayte v. United States*, 470 U.S. 598, 608, (1985) (cleaned up) ("although prosecutorial discretion is broad, it is not unfettered"). Plaintiff's injuries do not depend on any executive determination regarding the legality of a person's residence in the country; instead, they challenge government targeting based on protected speech and advocacy with a specific viewpoint distinct and discernable from an individual's immigration status. *See NWDC Resistance v. ICE*, 493 F. Supp.3d 1003 (W.D. Wash. 2020) (finding no jurisdictional bars to reviewing organizations' First Amendment claim against ICE policy of targeting outspoken activists). Put simply, "[t]he executive cannot selectively enforce the law in a way that violates the Constitution." *Frederick Douglass Found., Inc. v. Dist. of Columbia*, 82 F.4th 1122, 1137 (D.C. Cir. 2023).

### B. Plaintiffs have Standing to Seek Relief

An organization has standing to sue for injunctive relief on its own behalf where the challenged act affects the organization's ability to function, or to "vindicate its own concrete interest in performing the activities for which it was formed." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 611 (1982). As a result of the anticipated raids, Plaintiffs have already altered their core programming to accommodate their members' urgent needs. *See* OCAD Declaration at ¶¶ 9-15; BPNC Declaration at ¶ 11-16; ICIRR Declaration at ¶¶ 8-11; RTF Declaration at ¶¶ 7-8, 11-16. If raids occur, Plaintiffs will not only continue these activities but also will spend significant time

responding to them. All of these actions hamper and impede ICIRR, BPNC, RTF, and OCAD's abilities to engage in policy advocacy and community outreach work central to their mission, draining organizational resources that would otherwise go to these affirmative advocacy efforts. *See id. See Farm Lab. Org. Comm. v. United States Border Patrol,* 162 F. Supp. 3d 623, 636 (N.D. Ohio 2016), *aff'd sub nom. Muniz-Muniz v. United States Border Patro*l, 869 F.3d 442 (6th Cir. 2017) ("A drain on an organization's resources constitutes a 'concrete and demonstrable injury for standing purposes.'"). In addition, some of Plaintiffs' members face the imminent threat of arrest by ICE as a result of the planned retaliatory raids. As explained above, "[t]he Supreme Court has often noted that a realistic threat of arrest is enough to chill First Amendment rights." *City of Houston, Texas v. Hill*, 482 U.S. 451, 459 n.7 (1987).

## CONCLUSION

For the foregoing reasons, the Court should enter a TRO/preliminary injunction that will: enjoin the Defendants from engaging in the federal actions described in this complaint and specifically prohibit the Defendants from threatening and/or executing Chicago-based immigration raids for the unlawful purpose of targeting and ultimately destroying the Sanctuary City movement.

Dated: January 24, 2025                         Respectfully Submitted,

<div style="margin-left: 40%;">

/s/ Sheila A. Bedi
Sheila A. Bedi
Eliana Green
Community Justice and Civil Rights Clinic
Northwestern Pritzker School of Law
375 E. Chicago Ave.,
8th Floor Chicago, IL 60611
Phone: 312-503-2492
Sheila.bedi@law.northwestern.edu

</div>

Sejal Zota*
Dinesh McCoy*
Daniel Werner*
Just Futures Law
1629 K Street N.W., Suite 300
Washington, DC 20006
Phone: (617) 812-2822
sejal@justfutureslaw.org
dinesh@justfutureslaw.org
daniel@justfutureslaw.org
*_pro hac vice_ application forthcoming

Daniel Massoglia
MK Law, LLC
2020 Janice Avenue
Melrose Park, IL 60160
Phone: 312 545 8660
dm@mklawchicago.com