UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ORGANIZED COMMUNITIES AGAINST DEPORTATIONS, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 25 C 868 |
| | ) | Judge Kness |
| DONALD TRUMP, President of the United States, *et al.*, | ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN
OPPOSITION TO PLAINTIFFS MOTION FOR A
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

BRETT A. SHUMATE
Acting Assistant Attorney General

DAVID M. MCCONNELL
Director

AUGUST E. FLENTJE
Deputy Director

EREZ REUVENI
Assistant Director

BRENDAN MOORE
Trial Attorney

CHRISTOPHER IAN PRYBY
Trial Attorney

MORRIS PASQUAL
Acting United States Attorney

CRAIG A. OSWALD
Assistant United States Attorney

s/ Joshua S. Press
JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7625
joshua.press@usdoj.gov

*Attorneys for Defendants*

**Table of Contents**            **Page**

Introduction ...........................................................................................................................1

Background .........................................................................................................................4

    I.     Statutory And Regulatory History ...........................................................................4

    II.    Factual And Procedural History................................................................................6

Legal Standard ...................................................................................................................7

Argument ............................................................................................................................8

    I.     Plaintiffs' Motion Should Be Denied Because Their Claims Have No
           Likelihood of Success .............................................................................................8

        A.  The Plaintiffs Lack Standing .............................................................................8

             1.     No Injury In Fact.......................................................................................10

             2.     No Causation or Redressability .................................................................13

        B.  This Court Statutorily Lacks Jurisdiction To Issue The Requested
            Injunction .........................................................................................................15

        C.  The Plaintiffs' First Amendment Claim Also Fails ...........................................17

    II.    The Plaintiffs Have Not Shown Irreparable Harm ...............................................21

    III.   The Balance of Equities and the Public Interest Favor Defendants......................23

Conclusion .......................................................................................................................25

## Table of Authorities

**Cases**                                                                    **Page(s)**

*Access Living of Metro. Chicago v. Uber Techs., Inc.*,
   351 F. Supp. 3d 1141 (N.D. Ill. 2018) ................................................................. 13

*Am. Civil Liberties Union of Ill. v. Alvarez*,
   679 F.3d 583 (7th Cir. 2012) ....................................................................... 10

*Arizona v. United States*,
   567 U.S. 387 (2012) ................................................................................. 15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................. 20

*Bell v. Keating*,
   697 F.3d 445 (7th Cir. 2012) ....................................................................... 11

*Camarena v. Dir. of ICE*,
   988 F.3d 1268 (11th Cir. 2021) ..................................................................... 16

*Carrillo v. USCIS*, No. 23 C 6298,
   2024 WL 2722696 (N.D. Ill. May 28, 2024) ......................................................... 22

*Cassell v. Snyders*,
   990 F.3d 539 (7th Cir. 2021) .................................................................. 23, 24

*Christian Legal Soc'y v. Walker*,
   453 F.3d 853 (7th Cir. 2006) ........................................................................ 8

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) ................................................................................... 8

*D.W. v. Illinois*,
   690 F. Supp. 3d 808 (N.D. Ill. 2023) ................................................................ 10

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ................................................................................. 14

*De Canas v. Bica*,
   424 U.S. 351 (1976) ................................................................................. 23

*Disability Rts. Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*,
   522 F.3d 796 (7th Cir. 2008) ......................................................................... 9

*E.F.L. v. Prim,*
    986 F.3d 959 (7th Cir. 2021) ............................................................... 6, 7, 16

*FDA v. All. for Hippocratic Med.,*
    602 U.S. 367 (2024) ............................................................................. *passim*

*Garland v. Aleman Gonzalez,*
    596 U.S. 543 (2022) ................................................................................. 2, 17

*Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis,*
    35 F.3d 1134 (7th Cir. 1994) ........................................................................ 24

*Gonzalez v. City of New York,*
    845 F. App'x 11 (2d Cir. Feb. 9, 2021) ........................................................ 19

*Habitat Educ. Ctr. v. U.S. Forest Serv.,*
    607 F.3d 453 (7th Cir. 2010) ........................................................................ 24

*Hamama v. Adducci,*
    912 F.3d 869 (6th Cir. 2018) ........................................................................ 16

*Harp Adver. Ill., Inc. v. Vill. of Chi. Ridge,*
    9 F.3d 1290 (7th Cir. 1993) .......................................................................... 14

*Hartman v. Moore,*
    547 U.S. 250 (2006) ...................................................................................... 19

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982) ................................................................................... 2, 9

*Ill. Republican Party v. Pritzker,*
    973 F.3d 760 (7th Cir. 2020) .......................................................................... 8

*INS v. Miranda,*
    459 U.S. 14 (1982) ........................................................................................ 20

*Int'l Union, Allied Indus. Workers of Am., AFL–CIO v. Local Union No. 589,*
    693 F.2d 666 (7th Cir. 1982) ................................................................... 21, 22

*Kitterman v. Belleville,*
    66 F.4th 1084 (7th Cir. 2023) ....................................................................... 18

*Laird v. Tatum,*
    408 U.S. 1 (1972) ................................................................................... 10, 18

*Legal Aid Chi. v. Hunter Props., Inc.*, No. 23 C 4809,
    2024 WL 4346615 (N.D. Ill. Sept. 30, 2024) ....................................................... 2, 9

*Linda R. S. v. Richard D.*,
    410 U.S. 614 (1973) ................................................................................................. 2

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................ 9, 11

*Lund v. City of Rockford*,
    956 F.3d 938 (7th Cir. 2020) ................................................................................. 21

*MainStreet Org. of Realtors v. Calumet City, Ill.*,
    505 F.3d 742 (7th Cir. 2007) ................................................................................. 11

*Marbury v. Madison*,
    5 U.S. (1 Cranch) 137 (1803) ................................................................................ 22

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ................................................................................................. 8

*Michigan v. U.S. Army Corps of Eng'rs*,
    667 F.3d 765 (7th Cir. 2011) ................................................................................... 8

*Milliman v. County of McHenry*,
    893 F.3d 422 (7th Cir. 2018) ................................................................................. 18

*Munaf v. Geren*,
    553 U.S. 674 (2008) ................................................................................................. 7

*Nielsen v. Preap*,
    586 U.S. 392 (2019) ................................................................................................. 5

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) .......................................................................................... 18, 21

*Niz-Chavez v. Garland*,
    593 U.S. 155 (2021) ............................................................................................... 15

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................................................... 23, 24

*Plotkin v. Ryan*,
    239 F.3d 882 (7th Cir. 2001) ............................................................................ 14, 15

*Rauda v. Jennings*,
    55 F.4th 773 (9th Cir. 2022) ...................................................................... 16

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) .................................................................... *passim*

*Speech First, Inc. v. Killeen*,
    968 F.3d 628 (7th Cir. 2020) ...................................................................... 11

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ...................................................................................... 11

*Steinle v. City & County of San Francisco*,
    230 F. Supp. 3d 994 (N.D. Cal. 2017) ...................................................... 23

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ................................................................................. 8, 14

*Sure-Tan, Inc. v. NLRB*,
    467 U.S. 883 (1984) ............................................................................... 10, 23

*Tazu v. Att'y Gen.*,
    975 F.3d 292 (3d Cir. 2020) ...................................................................... 16

*TikTok Inc. v. Garland*,
    604 U.S. —, 2025 WL 222571 (2025) ...................................................... 18

*United States ex rel. Turner v. Williams*,
    194 U.S. 279 (1904) ...................................................................................... 18

*United States v. Texas*,
    599 U.S. 670 (2023) ...................................................................................... 10

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ........................................................................................ 7

*USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*,
    402 F. Supp. 3d 427 (N.D. Ill. 2019) .......................................................... 8

*Valencia v. City of Springfield*,
    883 F.3d 959 (7th Cir. 2018) ...................................................................... 24

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ........................................................................................ 9

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................ 8

**Statutes**

6 U.S.C. § 557 .................................................................................... 5

8 U.S.C. § 1101 .................................................................................. 5

8 U.S.C. § 1103 .................................................................................. 5

8 U.S.C. § 1225(b)(1) ........................................................................ 4

8 U.S.C. § 1225(b)(1)(A) .................................................................. 4

8 U.S.C. § 1226 ................................................................................ 17

8 U.S.C. § 1229(a) ............................................................................ 4

8 U.S.C. § 1229a(a)(2) ...................................................................... 4

8 U.S.C. § 1231 ................................................................................ 17

8 U.S.C. § 1252(a)(5) ........................................................................ 4

8 U.S.C. § 1252(f)(1) .............................................................. 2, 5, 15

8 U.S.C. § 1252(g) .................................................................. 5, 15, 16

8 U.S.C. § 1357 ................................................................................ 21

19 U.S.C. § 1589(a) .......................................................................... 21

**Regulations**

8 C.F.R. § 239.1 ................................................................................. 4

8 C.F.R. § 1003.1(b) .......................................................................... 4

8 C.F.R. § 1003.6(a) .......................................................................... 4

8 C.F.R. § 1208.31(e) ........................................................................ 4

8 C.F.R. § 1240.12 ............................................................................. 4

## Introduction

This case involves an effort by four public-advocacy groups to halt immigration enforcement on the unprecedented and fundamentally flawed theory that it violates the First Amendment because they are purportedly against it. Such a theory has no basis in law, and the advocacy groups lack the sort of recognized interest that would allow this dangerous suit to proceed. Indeed, this kind of legal claim, if credited, could fundamentally undermine the ability of this country to govern itself.

The four plaintiffs here are organizations who advocate for immigrant rights. *See* Dkt. 10 ("Amended Complaint" or "Am. Compl.") at ¶¶ 10–13. They filed an amended motion for a temporary restraining order ("TRO") and preliminary injunction. Dkt. 7 ("Plaintiffs' Motion" or "Pls.' Mot."). In a nutshell, Plaintiffs' Motion asserts that the federal government's immigration-related investigations and arrests in Chicago violate their freedom of speech because the government is engaging in viewpoint discrimination to "quash the Sanctuary City movement."[1] *Id.* at 1. Plaintiffs' Motion should be denied because it fails to satisfy *any* of the needed criteria for preliminary relief.

To begin with, plaintiffs cannot show a substantial likelihood of success on the merits for a host of reasons. First, they lack standing here because they have no special claim to the City of Chicago's "sanctuary city" policies or practices. Nor do plaintiffs allege that they will be directly affected by the federal government's law enforcement vis-à-vis immigration-related investigations or arrests. They simply wish for this court to agree with their own policy preferences about

---

[1] According to the Oxford English Dictionary, a "sanctuary city" is defined as "a city regarded as offering a degree of protection to undocumented immigrants, in particular by having policies in place to limit cooperation with federal immigration authorities." *See* https://www.oed.com/dictionary/sanctuary-city_n?tab=meaning_and_use#1225613800100 (last accessed Jan. 29, 2025).

immigration-related enforcement and issue an injunction to that effect. *See* Pls.' Mot. at 16. But "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Linda R. S. v. Richard D.*, 410 U.S. 614, 619 (1973). Pursuing such relief via organizational standing based on ideological alignment or spent resources is an extraordinary extension of this established law limiting standing and fares no better. *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 394 (2024) ("A plaintiff must show 'far more than simply a setback to the organization's abstract social interests.'" (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982))); *Legal Aid Chi. v. Hunter Props., Inc.*, No. 23 C 4809, 2024 WL 4346615, at *14 (N.D. Ill. Sept. 30, 2024). Indeed, the plaintiffs' actual "free speech" claim appears to be against the federal government's disapproval of the City of Chicago's *policies*, rather than any attempt to squelch the plaintiffs' own speech. There is no genuine evidence that the federal government would have taken a different approach if the plaintiffs here were silent, or even changed their position on Chicago's sanctuary policies. Their speech just happens to incidentally be about a topic of public debate, rather than being the cause of defendants' enforcement actions.

Second, Congress has repeatedly legislated to eliminate jurisdiction over such challenges to the Executive's initiation, adjudication, or execution of removal orders against foreign nationals. *See* 8 U.S.C. §§ 1252(f)(1) and 1252(g). Section 1252(f)(1) prohibits lower courts from entering injunctions on behalf of anyone other than an individual foreign national, including the public-interest groups suing here in cases that would order federal officials to take (or to refrain from taking) actions to enforce, implement, or otherwise carry out the specified statutory provisions of 8 U.S.C. §§ 1221–1232, which govern the inspection, apprehension, and removal of foreign nationals. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 549–51 (2022). Correspondingly,

"Section 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 485 n.9 (1999). That is precisely the "evil" that plaintiffs aim to achieve here—frustrating federal enforcement priorities. *See* Pls.' Mot. at 16.

Third, the plaintiffs' free-speech arguments are fundamentally flawed. At a basic level, persons challenging the enforcement of federal laws—whether in the immigration context or elsewhere—do not have viable First Amendment arguments even when the challenged laws are not supported by an advocacy group that has robust viewpoint-based free speech rights to speak about their public-interest goals. And here, the plaintiffs' sparse allegations fail to support an inference that defendants plan to take any action against them (or anyone else) that is motivated by *speech*. Instead, defendants' law enforcement efforts are supported by a rationale wholly independent of whatever so-called sanctuary cities (or their voters) may, or may not, wish to advocate: "to bring to an end *an ongoing violation* of United States law." *See AADC*, 525 U.S. at 491 (emphasis in original).

The plaintiffs have likewise not met their burden of demonstrating immediate and irreparable harm absent injunctive relief. The harms plaintiffs claim amount to little more than a restatement of their strained, erroneous First Amendment theory. That is, that plaintiffs are ostensibly being harmed due to federal law enforcement's alleged disagreement with the plaintiffs' preferred "sanctuary" policies. This is not an injury. And finally, plaintiffs cannot establish that the balancing of the harm and the public interest weighs in favor of injunctive relief because defendants have a strong interest in enforcing the law to protect U.S. citizens and lawful residents—especially with respect to the investigative, arrest, and prosecutorial authorities

delegated to the Executive as established by Congress. This court should therefore deny Plaintiffs' Motion in its entirety.

## Background

### I.     Statutory And Regulatory History

The Immigration and Nationality Act ("INA") establishes the framework for arresting, detaining, and removing noncitizens who are unlawfully present or otherwise removable in the United States. The removal process typically begins when the United States Department of Homeland Security ("DHS") encounters an unlawfully present foreign national, serves that person with charges alleging removability, and places them into a removal proceeding. *See* 8 U.S.C. § 1229(a); 8 C.F.R. § 239.1; *see also* 8 U.S.C. §§ 1225(b)(1), 1228(b), 1187(b)(2), 1231(a)(5); 8 C.F.R. § 1208.31(e) (instances of more limited proceedings in specific circumstances). DHS chooses which charges of removability to pursue, *see* 8 U.S.C. § 1229a(a)(2), and an immigration adjudicator (usually an immigration judge) determines whether the foreign national is removable, and if so, whether to enter an order of removal, *see* 8 U.S.C. §§ 1225(b)(1)(A)(i), 1229a(a); 8 C.F.R. § 1240.12. Those subject to expedited removal proceedings who assert a fear of harm upon removal are screened for fear-based relief and protection. 8 U.S.C. § 1225(b)(1)(A). Anyone subject to a removal order issued by an immigration judge may file an appeal before the Board of Immigration Appeals ("BIA"), *see* 8 C.F.R. §§ 1003.1(b), 1240.15, and the removal order is stayed pending appeal, 8 C.F.R. § 1003.6(a). If the BIA dismisses the appeal, the foreign national may then petition for review in a court of appeals and request a further stay of removal pending review. 8 U.S.C. § 1252(a)(5). Once an order of removal is final, *see id.* § 1101(a)(47)(B), and absent a stay, the foreign national is subject to removal, *see id.* §§ 1231(a)(1)(A)–(B).

To enforce the immigration laws, DHS possesses the power to arrest and detain foreign nationals. *See* 8 U.S.C. § 1225(b)(1)(B)(ii) (requiring detention for certain foreign nationals

pending consideration of a request for asylum), § 1226(a) (permitting arrest and detention upon warrant issued by the Secretary of Homeland Security); § 1231(a)(2) (authorizing detention of foreign nationals with final removal orders and mandating it for certain criminal aliens); § 1357(a) (listing powers of DHS that may be exercised without warrant, including interrogation of "any alien or person believe to be an alien as to his right to be or remain in the United States" and arrest in certain circumstances).[2]

To streamline removal proceedings, Congress has restricted judicial review by removing courts' jurisdiction to hear certain claims in certain forums. For example, and as alluded to above, except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or claim or of the identity of the [plaintiff], no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of" 8 U.S.C. §§ 1221–32. 8 U.S.C. § 1252(f)(1). Section 1252(g) is another jurisdictional shield. It deprives all courts of "jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien," notwithstanding "any other provision of law (statutory or nonstatutory)" other than § 1252 itself. 8 U.S.C. § 1252(g); *see also AADC*, 525 U.S. at 486–87 (noting how the provision is "aimed at protecting the Executive's discretion from the courts—indeed, that can fairly be said to be the theme of the legislation" and that "that provision is specifically directed at the deconstruction, fragmentation, and hence prolongation of removal

---

[2] Many provisions of the INA still refer to the Attorney General, but in 2002, Congress transferred much of the INA's authority to the Secretary of Homeland Security. *See* 6 U.S.C. § 557; 8 U.S.C. § 1103; *see also Nielsen v. Preap*, 586 U.S. 392, 397 n.2 (2019) ("Congress has empowered the Secretary to enforce the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*, though the Attorney General retains the authority to administer removal proceedings and decide relevant questions of law.").

proceedings"); *E.F.L. v. Prim*, 986 F.3d 959, 965 (7th Cir. 2021) ("1252(g) precludes judicial review of 'any' challenge to 'the decision or action by [DHS] to . . . execute removal orders,'" which "includes challenges to DHS's 'legal authority' to do so.").

## II.  Factual And Procedural History

Plaintiffs describe themselves as "Chicago-based organizations that provide advocacy and support to Chicago's immigrant communities."  Pls.' Mot. at 1; *see also* Am. Compl. ¶ 1. Plaintiffs lobby for their preferred policies and provide, among other things, information, legal advice and representation, and educational support to immigrants and others in Chicago.  Dkt. 7-1 ("Gutierrez Decl.") at ¶¶ 6, 7, 9, 13; Dkt. 7-2 ("Brosnan Decl.") at ¶¶ 8–10; Dkt. 7-3 ("Tsao Decl.") at ¶¶ 3, 5, 7; Dkt. 7-4 ("Zaman Decl.") at ¶¶ 4, 7.  Their political advocacy also extends to protests and social media.[3]

The defendants run the gamut of law enforcement within the Executive Branch concerning immigration-related affairs.  *See* Am. Compl. ¶¶ 14–22.  Plaintiffs maintain that defendants are responsible for operations to detain foreign nationals without lawful status in Chicago, targeting especially those with criminal convictions.  *See, e.g.*, Dkt. 8-1; Dkt. 8-3; Dkt. 9-1 (noting how immigration-related arrests on January 26, 2025, "were targeted across the Chicago area and didn't affect churches or workplaces").  Plaintiffs allege that, in response to

---

[3]  *See, e.g.*, Chicago Alliance Against Racist & Political Repression, https://www.instagram.com/caarprnow/p/DFEgx0DxbIO (last accessed Jan. 27, 2025) (photos and videos depicting protest of January 20, 2025, at "Chicago's federal plaza and Trump hotel"); https://www.instagram.com/caarprnow/p/DFBaKFYvVC7/?img_index=2 (last accessed Jan. 27, 2025) (showing some plaintiffs as endorsing the protest); Organized Communities Against Deportations, https://www.facebook.com/reel/1985087862001695 (last accessed Jan. 26, 2025) ("ICE is on the move"); https://www.instagram.com/ocadchicago/p/DFTX0fJPmLm (last accessed Jan. 26, 2025) (advising people to deny entry permission to law enforcement without a warrant, deny consent to search, and not to answer law-enforcement officers' questions or provide documentation, and providing a telephone number for support in case of ICE detention).

announcements that defendants planned to enforce immigration laws in Chicago, they have diverted time and resources away from their usual policy-advocacy and support missions. That is, the plaintiffs maintain that they are now providing informational and emotional support to immigrants and their families, training volunteers, and organizing "rapid response groups." *See, e.g.*, Gutierrez Decl. ¶¶ 10–12.

Plaintiffs filed their initial complaint on January 25, 2025, along with their initial motion for a temporary restraining order and preliminary injunction. Dkt. 1 & 2. After reviewing the initial complaint and initial motion, the emergency judge ordered defendants to respond on or before noon on January 29, with plaintiffs' deadline to reply by 5:00 p.m. on January 30. Dkt. 6. The emergency judge explained that, among other things, "there is substantial reason to question whether the alleged injury to the organizations (potentially distinct from individuals) would justify a no-response TRO." *Id.* Plaintiffs' Motion was then filed later that same day, including declarations from representatives of each plaintiff organization. Dkt. 7. Plaintiffs next moved the court to reconsider its briefing order, Dkt. 9, and shortly thereafter filed their Amended Complaint, Dkt. 10. The emergency judge denied plaintiffs' motion to reconsider, stating that plaintiffs had provided no citation for the proposition that "courts '*routinely* constrain government action on First Amendment grounds in situations where government officials take action that—on the surface—is unrelated to the regulation of speech.'" Dkt. 11. The next day, this court refused to disturb the previously set briefing schedule. Dkt. 14.

### Legal Standard

Plaintiffs' Motion seeks both a TRO and a preliminary injunction. Such relief is meant to preserve the status quo pending a final, legal determination on the merits of the case. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). A preliminary injunction is "never awarded as of right," *Munaf v. Geren*, 553 U.S. 674, 690 (2008), and "is an extraordinary and drastic remedy,

one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotations omitted). "The standards for granting a temporary restraining order and preliminary injunction are the same." *USA-Halal Chamber of Commerce, Inc. v. Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 (N.D. Ill. 2019) (collecting cases). More specifically, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765 (7th Cir. 2011).

As the Seventh Circuit has explained, an "applicant must make a strong showing that she is likely to succeed on the merits." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). "[A] possibility of success is not enough. Neither is a 'better than negligible' chance." *Id.* Movants must also demonstrate clearly, and through specific factual allegations, that immediate and irreparable injury will result to them absent the order. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02 (1983) (citations omitted). Only if the movant meets their burden of showing both a likelihood of success on the merits and an imminent risk of irreparable harm will courts then engage in further analysis. *See Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006).

### Argument

**I. Plaintiffs' Motion Should Be Denied Because Their Claims Have No Likelihood of Success**

#### A. The Plaintiffs Lack Standing.

To establish standing to "seek injunctive relief, a plaintiff must show that" it "is under threat of suffering" an "actual and imminent" injury caused by "the challenged action," and that "a favorable judicial decision will prevent" that injury. *Summers v. Earth Island Inst.*, 555 U.S.

488, 493 (2009). The "threatened injury must be certainly impending to constitute injury in fact"; allegations of "possible future injury do not satisfy . . . Art. III." *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation of someone else. *See All. for Hippocratic Med.*, 602 U.S. at 382.

An organization can have standing to sue either through "associational standing" or "organizational standing." *Legal Aid Chi.*, 2024 WL 4346615, at *6. Associational standing exists when an organization sues "on behalf of" its members, while organizational standing allows a group to sue based on an injury to the organization "in its own right." *Id.* (citing *Disability Rts. Wis., Inc. v. Walworth Cnty. Bd. of Supervisors*, 522 F.3d 796, 801 (7th Cir. 2008)). Although plaintiffs do not explicitly identify the type of standing they wish to invoke, Plaintiffs' Motion proceeds on the theory that the organizations themselves have experienced injury. *See* Pls.' Mot. at 15 ("An organization has standing to sue for injunctive relief *on its own behalf* where the challenged act affects the organization's ability to function." (emphasis added)). Still, organizations may have standing "to sue on their own behalf for injuries they have sustained." *All. for Hippocratic Med.*, 602 U.S. at 393–94 (citing *Havens Realty*, 455 U.S. at 379 n.19). In doing so, however, organizations must satisfy the usual standards for injury in fact, causation, and redressability that apply to individual plaintiffs. *Id.* at 378–79. Like individuals, an organization may not establish standing based on the intensity of the litigant's interest or because of strong opposition to government conduct. *See id.* at 394.

### 1. No Injury In Fact

As alluded to above, there is no concrete or particularized injury here because the plaintiffs are not objecting to their own speech being affected or chilled—but that of a larger "movement" in favor of "sanctuary" policies. *See, e.g.*, Pls.' Mot. at 5 (noting "Plaintiffs' expressive conduct in support of their movement"). The problem here is that the "movement" plaintiffs claim is being chilled is a policy disagreement and not a particularized injury to the plaintiffs themselves. *See Laird v. Tatum*, 408 U.S. 1, 13–14 (1972) (no injury in fact because "a plaintiff's notional or subjective fear of chilling is insufficient to sustain a court's jurisdiction under Article III"). This is why, for example, it is substantially more difficult to have standing to challenge the enforcement (or, for that matter, the non-enforcement) of laws *against other people*. *See United States v. Texas*, 599 U.S. 670, 673 (2023) ("The Court's Article III holding in *Linda R. S.* applies to challenges to the Executive Branch's *exercise of enforcement discretion* over whether to arrest or prosecute."); *see also Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (citing *Linda R. S.* in the immigration context because the plaintiffs had "no judicially cognizable interest in procuring enforcement of the immigration laws" by the Executive Branch). When the basis of asserted injury is the claim that an organization simply opposes law enforcement prioritization, there is no injury. *See, e.g.*, *All. for Hippocratic Med.*, 602 U.S. at 382 ("The injury in fact requirement prevents the federal courts from becoming a vehicle for the vindication of the value interests of concerned bystanders." (quotations omitted)); *see also Mathews on behalf of D.W. v. Illinois*, 690 F. Supp. 3d 808, 826 (N.D. Ill. 2023) ("Federal 'courts generally lack meaningful standards for assessing the propriety of enforcement choices in this area.'" (quoting *Texas*, 599 U.S. at 679)).

Moreover, to bring a free speech claim, a plaintiff may show an intention to engage in a course of expressive conduct arguably limited by a challenged policy, and that he faces a credible threat the policy will be enforced *against him* when he does. *See Am. Civil Liberties Union of Ill.*

*v. Alvarez*, 679 F.3d 583, 590–91 (7th Cir. 2012). Most relevant here is how a plaintiff may also show a chilling effect on his speech that is objectively reasonable, and that he self-censors as a result. *Bell v. Keating*, 697 F.3d 445, 454 (7th Cir. 2012) (citing *Laird*). For either that credible threat of enforcement or chilling effect to be "'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560); *see also Bell*, 697 F.3d at 454 ("The plaintiff must substantiate a concrete and particularized chilling effect on *his* protected speech or expressive conduct to pursue prospective relief." (emphasis added)). No particularized impediment to plaintiffs' speech (at all) is alleged in Plaintiffs' Motion, and the exhibits provided are not focused on speech at all, but on policy preferences for the City of Chicago *as a whole*—not plaintiffs themselves or even their individual members.[4] *See* Dkt. 8, 8-1–3. This undermines the plaintiffs' assertion that *their own* free speech is being chilled. *See, e.g.*, *Speech First, Inc. v. Killeen*, 968 F.3d 628, 640 (7th Cir. 2020) (no chilling effect where "Speech First has failed to identify in the record specific statements any students wish to make that the University's policies have chilled"); *Bell*, 697 F.3d at 454 (requiring a showing of a particularized chilling effect).

In addition, plaintiffs have failed to establish that they have organizational standing because the immigration enforcement they fear has not impeded their core business activities. *See id.* As the organization's declarations exhibit, plaintiffs contend they should be afforded standing because threatened raids have caused the advocacy groups to expend considerable time, energy, and resources "to accommodate their members' urgent needs." Pls.' Mot. at 15. This work, which

---

[4] To the extent Plaintiffs' Motion suggests that plaintiffs have standing based on injuries to others, *see* Pls.' Mot. at 14, that approach is equally wrong, *see MainStreet Org. of Realtors v. Calumet City, Ill.*, 505 F.3d 742, 746 (7th Cir. 2007) ("The [plaintiff's] suit thus is barred by the principle that, subject to certain exceptions, one cannot sue in a federal court to enforce someone else's legal rights.").

they say was previously not part of their day-to-day advocacy, includes educating foreign nationals concerning their rights to prepare them to respond to the "planned raids." *See* Brosnan Decl. ¶ 11; Gutierrez Decl. ¶ 11. As recently explained in *Alliance for Hippocratic Medicine*, however, this theory of "injury in fact" fails because standing does not exist whenever "an organization diverts its resources in response to a defendant's actions." 602 U.S. at 395. For organizational plaintiffs to have an injury in fact, they must also point to an "impediment to [their] advocacy businesses." *Id.* (analogizing one such set of circumstances where this impediment was found present to be "not dissimilar to a retailer who sues a manufacturer for selling defective goods to the retailer.").

In this case, and as illustrated in plaintiffs' declarations, the threatened raids they oppose have not presented any such fundamental interference with the organizations' core advocacy activities. While the plaintiffs have missions that are somewhat distinct, each advocates for immigrants' rights. Indeed, the declarations make clear that all four plaintiffs are steadfastly involved in sanctuary-city advocacy. *See* Gutierrez Decl. ¶ 11 (organization "has advocated Chicago's status as a sanctuary city since its formation in 2013" and "aimed to keep a clear line of separation between local police and federal immigration authorities"); Brosnan Decl. ¶ 11 (organization has played an active role in promoting Chicago sanctuary city policies"); Tsao Decl. ¶¶ 5, 7 (organization has "been a part of the sanctuary city movement at both the local and state level for years"); Zaman Decl. ¶¶ 6, 9 (organization helped to "educate workers about the effort and their rights under the Welcoming City ordinance"). Enforcement of federal immigration law does not prevent plaintiffs from advocating against it.

In addition to such policy advocacy, the declarations reflect that the plaintiffs also serve foreign nationals at the grassroots level. *See* Gutierrez Decl. ¶ 5 (describing group "[a]s an undocumented-led group that organizes against deportations, detention, criminalization, and

incarceration of Black, brown, and immigrant communities in Chicago and surrounding areas");
Brosnan Decl., ¶ 4 (describing mission "to improve the quality of life for the . . . immigrant
populations of Chicago's southwest side");  Tsao Decl. ¶ 4 (noting how group "promotes the rights
of immigrants and refugees").  Yet although the organizations all claim the threatened raids have
necessitated that they divert their attention and resources from their normal day-to day advocacy
work, they merely point to a different advocacy role within the same broad mission that is a
constant.  *See* Tsao Decl. ¶ 4 ("Because of the staff time needed to respond to urgent requests
related to [U.S. Immigration and Customs Enforcement ("ICE")] raids," the group "shifted time
and resources away from our core campaign work for *immigrant economic justice*." (emphasis
added)); Brosnan Decl. ¶ 4 (explaining how organization shifted its priorities from general mental
health services for youth to mental health resources specifically to "youth who hope to process and
discuss how the fear of immigration enforcement is impacting them and their families"); Zaman
Decl. ¶¶ 6, 9 (discussing how earlier this month, the group held a meeting with city council
members to oppose roll backs in Chicago's "Welcoming City" ordinance to fielding calls and in-
person questions regarding what to do in the event of a workplace or home raid).

## 2.  No Causation or Redressability

Even if plaintiffs could establish an actual injury, they could not establish either that such
an injury was caused by any alleged federal government policy or that enjoining the policy would
prevent further harm.  This matters because plaintiffs must also allege that their injuries are
causally connected to defendants' actions and that a decision in their favor is likely to redress their
injuries. "These two requirements "overlap as two sides of a causation coin" because "if a
[defendant's] action causes an injury, enjoining the action usually will redress that injury." *Access
Living of Metro. Chicago v. Uber Techs., Inc*., 351 F. Supp. 3d 1141, 1151 (N.D. Ill. 2018), *aff'd*,
958 F.3d 604 (7th Cir. 2020).  A plaintiff "bear[s] the burden of establishing standing, and each

element, including redressability, must be supported by more than unadorned speculation." *Plotkin v. Ryan*, 239 F.3d 882, 885 (7th Cir. 2001).

Despite bearing the burden, the plaintiffs here fail to even address either the causation or redressability elements of standing. *See* Pls.' Mot. at 14. Plaintiffs do not allege, nor could they, that any federal enforcement actions in the City of Chicago are unlawful. As they state, "Plaintiffs here do not challenge the Federal Government's authority to commence any individual immigration enforcement proceedings. Instead, the challenge is focused on the federal government's unconstitutional policy decision to raid the City of Chicago because of its animus towards the Sanctuary City movement and to deter Plaintiffs from further Sanctuary City advocacy." *Id.* But in the absence of this purported animus, the federal government would have no less authority to "commence any individual immigration enforcement proceedings." *Id.*

Moreover, were such enforcement actions carried out in the future, plaintiffs' members or constituents would nonetheless be overwhelmingly likely to seek the very same counseling and advocacy services that plaintiffs here attribute to the alleged retributive enforcement actions. *See Harp Adver. Ill., Inc. v. Vill. of Chi. Ridge,* 9 F.3d 1290, 1292 (7th Cir. 1993) ("The question then is whether plaintiff's injury will likely be redressed by a favorable decision."). Thus, because it is purely speculative that a favorable ruling would address the plaintiffs' alleged injuries, they fail to establish the requisite redressability. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006) (finding "redressability [that] requires speculat[ion]" is insufficient to support standing).

In short, defendants cannot be found to have caused an injury capable of being redressed through injunctive relief, when the plaintiffs have not demonstrated they are "under threat of suffering" an "actual and imminent" injury. *See Summers*, 555 U.S. at 493. As argued above, plaintiffs' own decision to realign their allocation of immigration-related advocacy services does

14

not amount to "an impediment to [their] advocacy businesses." *All. for Hippocratic Med.*, 602 U.S. at 394. Accordingly, in the absence of an injury in fact, plaintiffs necessarily fail to establish the requisite causation and redressability elements to establish standing. *See Plotkin*, 239 F.3d at 885.

### B. This Court Statutorily Lacks Jurisdiction To Issue The Requested Injunction.

Another set of hurdles for plaintiffs to clear are the jurisdictional bars laid out in 8 U.S.C. §§ 1252(f)(1) and 1252(g). Plaintiffs' Motion never addresses these jurisdictional provisions.

Start with § 1252(g), which precludes judicial review of the decision to commence removal proceedings and execute removal orders. The language in 8 U.S.C. § 1252(g) is unequivocal:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title**,** no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien *arising from the decision or action by the Attorney General to commence proceedings*, adjudicate cases, *or execute removal orders against any alien* under this chapter.

8 U.S.C. § 1252(g) (emphases added). And the Supreme Court has noted this power of prosecutorial discretion on numerous occasions. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 396 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials. Federal officials, as an initial matter, must decide whether it makes sense to pursue removal at all."); *Niz-Chavez v. Garland*, 593 U.S. 155, 158 (2021) ("For more than a century, Congress has afforded the Attorney General (or other executive officials) discretion to allow otherwise removable aliens to remain in the country."). In *AADC*, for example, the Supreme Court considered the reach of § 1252(g) and concluded that the provision demands a narrow reading, but "applies . . . to three discrete actions that the [federal government] may take: [the] 'decision or action' to '*commence* proceedings, *adjudicate* cases, or *execute* removal orders.'" 525

U.S. at 482 (1999) (emphases in original). The provision confirms that "[a]t each stage the Executive has discretion to abandon the endeavor" without judicial interference. *Id*. at 483–84.

The Seventh Circuit's decision in *E.F.L. v. Prim*, 986 F.3d 959 (7th Cir. 2021), is helpful regarding the definition of what constitutes "any" challenge to one of these three stages. In *E.F.L.*, the plaintiff sought injunctive relief to prevent her deportation pending administrative review of another petition for immigration relief. *Id.* at 961–62. The court of appeals nonetheless held that § 1252(g) barred jurisdiction because the "habeas petition falls directly in § 1252(g)'s path" as she "challenge[d] DHS's decision to execute her removal order while she seeks administrative relief." *Id.* at 964. And *E.F.L.* likewise explained that "1252(g) precludes judicial review of 'any' challenge to 'the decision or action by [DHS] to . . . execute removal orders,'" which "includes challenges to DHS's 'legal authority' to do so." *Id.* at 965. The plaintiffs' First Amendment challenge is just such a challenge to the Executive's legal authority here to commence proceedings or, for those who have final orders of removal, to execute those removals. "Otherwise, § 1252(g) would be a paper tiger; any petitioner challenging the execution of a removal order could characterize his or her claim as an attack on DHS's 'legal authority' to execute the order and thereby avoid § 1252(g)'s bar. We will not render § 1252(g) so toothless." *Id.* (internal citations omitted). That decision is in line with four other courts of appeals and applies here. *Rauda v. Jennings*, 55 F.4th 773, 777–78 (9th Cir. 2022); *Camarena v. Dir. of ICE*, 988 F.3d 1268, 1274 (11th Cir. 2021) ("[W]e do not have jurisdiction to consider 'any' cause or claim . . . arising from the government's decision to execute a removal order. If we held otherwise, any petitioner could frame his or her claim as an attack on the government's *authority* to execute a removal order rather than its *execution* of a removal order."); *Tazu v. Att'y Gen.*, 975 F.3d 292, 297 (3d Cir. 2020); *Hamama v. Adducci*, 912 F.3d 869, 874 (6th Cir. 2018).

16

And if there were any doubts about this reading, § 1252(f)(1) should dispel them. That provision limits the jurisdiction of this court, and all courts other than the Supreme Court, to "restrain" the federal government from implementing its removal and detention procedures under the INA except as to *individual* foreign nationals. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). Again, § 1252(f)(1) provides that, except in a case brought by "an individual alien" in removal proceedings, and "[r]egardless of the nature of the action or claim or of the identity of the of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions" of 8 U.S.C. §§ 1221–32. That jurisdictional restriction applies in this case by its plain terms because, for example, 8 U.S.C. § 1226 specifically authorizes DHS to arrest and detain foreign nationals with a warrant. And 8 U.S.C. § 1231 authorizes for such arrested foreign nationals to be both detained and removed after removal proceedings. Consequently, § 1252(f)(1) bars the broad injunction and programmatic relief sought by Plaintiffs' Motion. *See* Pls.' Mot. at 16.

### C. The Plaintiffs' First Amendment Claim Also Fails.

Nor do plaintiffs' substantive arguments have any merit.[5] More specifically, Plaintiffs' Motion argues that plaintiffs' free speech is being "chilled" and their rights are being violated by defendants' enforcement and execution of immigration-related investigations or warrants. *See* Pls.' Mot. at 2. This is so because the plaintiffs support "sanctuary" policies, and law enforcement by the federal government that runs contrary to plaintiffs' preferred policy outcomes must thereby violate the First Amendment by discriminating against the plaintiffs' preferred policy viewpoint.

---

[5] The Amended Complaint includes three claims: (1) a free speech claim, Am. Compl. ¶¶ 101–09; a claim for declaratory relief under the Declaratory Judgment Act, *id.* at ¶¶ 110–13; and a claim under the Administrative Procedure Act ("APA"), *id.* at ¶¶ 114–21. Plaintiffs' Motion, though, seems to proceed *solely* on the plaintiffs' free speech claim. This is best shown by how Plaintiffs' Motion never even mentions either the Declaratory Judgment Act or the APA.

*See id.* at 4–7. To state this First Amendment theory is to show it is meritless and unworkable—especially in the immigration context. *Cf. United States ex rel. Turner v. Williams*, 194 U.S. 279, 292 (1904) (foreign-national anarchist could not make a viable free-speech claim to challenge his deportation merely because he gave pro-anarchist speeches while he was present in the United States).

In support of this expansive notion of free expression, Plaintiffs' Motion repeatedly points to defendants' purported "animus towards the Sanctuary City Movement." Pls.' Mot. at 11. One problem with plaintiffs' First Amendment approach is that they are not challenging a law, regulation, or policy where heightened judicial scrutiny under the First Amendment would ever come into play. *See, e.g.*, *TikTok Inc. v. Garland*, 604 U.S. —, 2025 WL 222571, at *3 (2025) (per curiam) ("*Laws* that directly regulate expressive conduct can, but do not necessarily, trigger such review." (emphasis added)). By never focusing on any law, regulation, or even an identified policy (other than an interest in more aggressive immigration-related enforcement operations), the plaintiffs here challenge prosecutorial prioritization under the guise of viewpoint discrimination. *See* Pls.' Mot. at 4–11; *see also id.* at 15 (discussing "selective enforcement"). This is not a First Amendment theory at all, but if it were, it would most closely resemble a First Amendment retaliation claim. *See, e.g.*, *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019); *Kitterman v. Belleville,* 66 F.4th 1084, 1091 (7th Cir. 2023) (extending the *Nieves* framework to attempted arrest claims).

Yet even if the court were to view the plaintiffs' free-speech theory through the prism of a retaliation claim, the plaintiffs' First Amendment argument would still fail. A claim for First Amendment retaliation has three elements: (1) that the plaintiff engaged in constitutionally protected speech; (2) that he suffered a deprivation because of government action; and (3) that his protected speech was a but-for cause of the government's action. *See Milliman v. County of*

*McHenry*, 893 F.3d 422 (7th Cir. 2018). That is, an actual intent to inhibit the speech of the plaintiff is an element of the claim. This is why plaintiffs must show that but for the protected activity, the government would not have taken the action complained of. *See Hartman v. Moore*, 547 U.S. 250, 265–66 (2006). In other words, "the plaintiff must prove pretext by showing that the adverse action would not have taken place 'but-for' the retaliatory motive." *Gonzalez v. City of New York*, 845 F. App'x 11, 14 (2d Cir. Feb. 9, 2021) (citing *Nieves*). It is simply not credible to say that the federal government enforcing immigration laws—a key aspect of the federal government's protection of its own sovereignty—is retaliation for the speech of the four plaintiffs in this lawsuit.

In this case, plaintiffs face a threshold barrier before the First Amendment retaliation standard need even be considered: in *AADC*, the Court held that, as a general matter, "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." *AADC*, 525 U.S. at 488. The Court in that case dealt with a factual scenario where the federal government was alleged to have targeted those plaintiffs as communists, but Justice Scalia's opinion for the Court nonetheless observed that selective prosecution claims "invade a special province of the Executive—its prosecutorial discretion." *Id.* at 489. Executive discretion is "ill-suited to judicial review" and "[j]udicial supervision in this area . . . entails systemic costs of particular concern . . . [which] are greatly magnified in the deportation context." *Id.* at 490 (internal quotation marks and citation omitted). Moreover, "in all cases, deportation is necessary in order to bring to an end *an ongoing violation* of United States law. The contention that a violation must be allowed to continue because it has been improperly selected is not powerfully appealing." *Id.* at 491 (emphasis in original).

Plaintiffs' Motion ignores this binding decision—which specifically dealt with both

19

immigration law and a lead plaintiff that was itself an immigration-related advocacy organization. While it is true that *AADC* noted how it "need not rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome," there is nothing in either Plaintiffs' Motion or the amended complaint to show how this is such a "rare case." 525 U.S. at 491. All that is alleged is plaintiffs' political disagreement with the Executive Branch regarding "sanctuary" policies that plaintiffs here happen to support. But that is nowhere close to being "so outrageous" as to overcome the considerations enunciated by the Supreme Court in *AADC*. *Id.*

Regardless of *AADC*'s nuances, the third element of a retaliation claim is not met here. This is because plaintiffs do not allege any basis for a plausible inference that defendants' "animus" or retaliatory motives *against the plaintiffs* is somehow behind (or could be behind) ICE agents arresting persons for immigration-related crimes, civil violations, or to execute their deportation. In fact, nothing is included in the complaint or Plaintiffs' Motion regarding whether *any* ICE decisionmaker is even aware of the plaintiffs' own political beliefs or advocacy. Allegations of temporal proximity do not support a plausible inference of retaliatory motivation or but-for causation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 676–77 (2009). Otherwise, ICE could be sued every time one of its officers took an enforcement action against a foreign national who participated in *any* public speech about immigration laws or their enforcement. In this respect, the plaintiffs' theory of retaliation ignores how a presumption of regularity attaches to the actions of government agencies, which means plaintiffs must allege some additional basis beyond a valid law-enforcement action itself to support an inference that such enforcement would not have occurred simply as a result of defendants performing their constitutional role of enforcing the immigration laws. *See   INS v. Miranda*, 459 U.S. 14, 18 (1982) (applying presumption of

20

regularity to review of visa application decision). In short, where ICE has probable cause to arrest or detain persons under its lawful authority,[6] First Amendment claims based on "animus" must fail. *See Nieves*, 587 U.S. at 405 ("The presence of probable cause should generally defeat a First Amendment retaliatory arrest claim."); *Lund v. City of Rockford*, 956 F.3d 938, 944 (7th Cir. 2020) (journalist's First Amendment retaliation claims fail because "[a]t the time of [plaintiff's] arrest, the officers had probable cause to arrest him").

## II.    The Plaintiffs Have Not Shown Irreparable Harm

This court should also deny Plaintiffs' Motion because plaintiffs have not carried their burden to show that they are likely to suffer imminent, irreparable harm. *See Int'l Union, Allied Indus. Workers of Am., AFL–CIO v. Local Union No. 589*, 693 F.2d 666, 674 (7th Cir. 1982).

As already explained, the plaintiffs themselves are in no danger of suffering a First Amendment injury from any exercise of defendants' authority to enforce the immigration laws. As the emergency judge in this matter aptly recognized, "none of the factual materials appear to suggest that these specific organizational plaintiffs are the target of the planned enforcement actions by the federal government. Instead, the targets of the planned arrests are, if the various news articles attached to the filings are to be believed, those persons who do not have legal immigration status in the United States." Dkt. 11 at 2–3. But beyond that mismatch, the plaintiffs' own actions show that their right to express their disagreement with the federal government's immigration-enforcement priorities has not been "chilled." From before the President's inauguration on January 20, 2025, until as recently as the day after filing this lawsuit, the plaintiffs have held rallies, posted frequently on social media, operated a phone hotline, provided legal

---

[6] Relatedly, ICE also has arrest authority for potential criminal prosecutions. *See* 8 U.S.C. § 1357; *see also* 19 U.S.C. § 1589(a) (which grants similar authority to agents within ICE's Homeland Security Investigations division).

information, and continued vigorous public debate about proper immigration policy. *See supra* n.4.

Further, the plaintiffs are incorrect that they have been "forced" to change their activities in response to planned immigration enforcement. They have instead voluntarily adapted to a changing political landscape and, in so doing, have chosen to advocate for their preferred policy outcomes, as is their right. *See* Pls.' Mot. at 12 ("Plaintiffs have expended time and resources to respond to urgent questions from community members about the risks of being targeted for immigration enforcement during daily activities like attending school, doctors' appointments, and church services."). Their actual complaint is, therefore, that they would *rather* be doing different kinds of activities—none of which the federal government's enforcement of the immigration laws prevents them from doing. *See id.* at 12 & n.14 (recounting allegations that they "modif[ied] planned programming to address responses and plans for immigration raids in workplaces, activat[ed] immigrant defense rapid response networks and supports in lieu of continuing with their affirmative advocacy on matters central to their mission"). But plaintiffs are more than welcome to continue advancing "matters central to their mission," and nothing the federal government is doing to others because of their immigration status prevents the plaintiffs from "continuing with their affirmative advocacy on [other] matters." *Id.*

In short, plaintiffs' true beef is that the federal government is now enforcing laws that they disagree with—and instead of seeking to persuade voters to support officials who will enact their preferred policies, they want this court to enjoin the Executive Branch from "tak[ing] Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. That is emphatically *not* "the province and duty of the judicial department," which is instead "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803); *cf. also Carrillo v. USCIS*, No. 23 C 6298, 2024 WL

2722696, at *3 (N.D. Ill. May 28, 2024) (Kness, J.) ("Civil immigration enforcement is a process in which the power of the Executive and the Legislature is significant, and that of the Judiciary limited."). Put another way, political disagreement with the execution of federal law is not by itself an imminent, irreparable injury. Plaintiffs no more have a cognizable First Amendment or imminent injury than did anti-Prohibitionists in the era of the Eighteenth Amendment, organized crime during the Kennedy administration, or segregationists in Little Rock. Plaintiffs' Motion should thus be denied.

## III. The Balance of Equities and the Public Interest Favor Defendants

The final two *Winter* factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because plaintiffs have not made either threshold showing, this court need not reach this element for preliminary relief. But plaintiffs have further failed to demonstrate—as they must—that their threatened irreparable injuries outweigh the threatened harm that preliminary injunctive relief would cause the federal government and the public interest—that is, nonparties.[7] *See Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021); *see also*

---

[7] Such as U.S. citizens, lawful permanent residents, and other foreign nationals with legal permission to be in the United States. They are third parties who may suffer injuries from unlawfully present foreign nationals who compete for employment and scarce resources. *See, e.g.*, *Sure-Tan*, 467 U.S. at 892; *De Canas v. Bica*, 424 U.S. 351, 356–57 (1976) ("[A]cceptance by illegal aliens of jobs on substandard terms as to wages and working conditions can seriously depress wage scales and working conditions of citizens and legally admitted aliens; and employment of illegal aliens under such conditions can diminish the effectiveness of labor unions."). Similarly, not enforcing immigration laws against such unlawfully present foreign nationals may result in U.S. persons becoming crime victims, especially from unlawfully present foreign nationals with serious criminal histories—who are targeted in immigration-enforcement actions. *See, e.g.*, S-5 – Laken Riley Act, 119th Cong. (Jan. 23, 2025) (not yet signed by the President); *Steinle v. City & County of San Francisco*, 230 F. Supp. 3d 994, 1004–05 (N.D. Cal. 2017) (mentioning "(1) a 2008 incident in which an undocumented immigrant with a history of violent felonies killed three people after he was released from custody in San Francisco, leading to a lawsuit against the City; and (2) studies demonstrating recidivism rates for undocumented immigrant criminals ranging from 16% to 28%").

*Nken*, 556 U.S. at 435. This court weighs these factors using a "sliding scale" approach: "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Cassell*, 990 F.3d at 545 (quoting *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018)).

In addressing the balance of the harms, Plaintiffs' Motion rests entirely on the conclusory statement that they "have clearly demonstrated that they are suffering a violation of their First Amendment Rights." Pls.' Mot. at 13. They therefore implicitly concede their inability to demonstrate any harm absent a clear victory on the merits (that is, their First Amendment argument). Hence, if this court does not find that plaintiffs "have clearly demonstrated" such a First Amendment harm (for the reasons discussed above), this court must deny their motion.

Finally, this court may grant plaintiffs preliminary injunctive relief only if the plaintiffs "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). Rule 65(c) thus makes some form of security *mandatory*. *See Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141 (7th Cir. 1994). Plaintiffs' conclusory assertion that the "requested relief will not impose any financial burden on the Defendants," Pls.' Mot. 14 n.17, overlooks that restraining active law enforcement operations *does* cost the federal government money. At the very least, transporting law-enforcement agents, support personnel, and equipment to Chicago in preparation for such enforcement actions does cost money, time, and manpower. Indeed, plaintiffs' arguments on this score fail to mention (in the one binding precedential case Plaintiffs' Motion cites), *see id.*, that the Seventh Circuit *affirmed* a $10,000 bond against a nonprofit organizational plaintiff, reasoning that the U.S. Forest Service "may lose money as a result of the" preliminary injunction obtained against it. *See Habitat Educ. Ctr. v. U.S. Forest*

*Serv.*, 607 F.3d 453, 458 (7th Cir. 2010). The remaining nonbinding precedent in plaintiffs' footnote that they rely upon (purportedly for the proposition that plaintiffs need not obtain a bond) should thus be ignored.

## Conclusion

For the foregoing reasons, the court should deny Plaintiffs' Motion.

Respectfully submitted,

BRETT A. SHUMATE
Acting Assistant Attorney General

DAVID M. MCCONNELL
Director

AUGUST E. FLENTJE
Deputy Director

EREZ REUVENI
Assistant Director

BRENDAN MOORE
Trial Attorney

CHRISTOPHER IAN PRYBY
Trial Attorney

MORRIS PASQUAL
Acting United States Attorney

CRAIG A. OSWALD
Assistant United States Attorney

 s/ Joshua S. Press
JOSHUA S. PRESS
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-7625
joshua.press@usdoj.gov

*Attorneys for Defendants*

25